[Crim. No. 2247. In Bank.—October 1, 1919.]

THE PEOPLE, Respondent, v. TOM WOO et al., Appellants.

[1] CRIMINAL LAW—SUFFICIENCY OF EVIDENCE—FUNCTION OF COURT AND JURY—APPEAL.—It is the function of the jury in the first instance, and of the trial court after verdict, to determine what facts are established by the evidence, and before the verdict of the jury, which has been approved by the trial court, can be set aside on appeal upon the ground of the insufficiency of the evidence to support it, it must be made clearly to appear that upon no hypothesis whatever is there substantial evidence sufficient to support the conclusion of the trial court.

[2] ID.—EVIDENCE—PROOF OF CRIMINAL CHARGE.—The determination of a charge in a criminal case involves proof that the offense charged was committed and that it was perpetrated by the person or persons accused thereof.

[3] ID.—APPEAL—PRESUMPTIONS IN FAVOR OF VERDICT.—Upon an appeal from a judgment in a criminal case, the court must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict.

[4] ID.—MURDER—SUFFICIENCY OF FACTS.—In this prosecution of two Chinese for the crime of murder, the facts which the jury could. have found were sufficient to sustain the verdict.

[5] ID.—MOTIVE—WHEN PROOF UNNECESSARY.—The presence or absence of motive is essentially a question of fact, and like any other fact, is not necessary to be proved if the crime can otherewise be established by sufficient competent evidence.

[6] ID. — MURDER—IMPEACHMENT OF TESTIMONY OF DEFENDANTS.— Where in a prosecution for murder the testimony of the defendants as to their movements the afternoon the crime was committed was clearly contradictory of certain extrajudicial statements imputed to them, an inquiry by the prosecution as to the making of such statements was material, and where the statements were neither admitted nor denied, the prosecution was entitled to impeach the defendants.

[7] ID.—CIRCUMSTANTIAL EVIDENCE—LEGALITY AND COMPETENCY—INSTRUCTION.—In a prosecution for murder, where the evidence is circumstantial in its nature, the giving of an instruction that the evidence which has been received is "legal and competent," and if it is, in the mind of the jury, of such a character as to exclude every reasonable theory or hypothesis other than that of defendants' guilt beyond a reasonable doubt, it should be given the same weight as direct evidence, is not objectionable as carrying an intimation to the jury that the court deemed the evidence, because it was "legal and competent," sufficient to convict.

[8] ID.—EVIDENCE—INSTRUCTIONS.—In this prosecution for the crime of murder, the contention that certain instructions treating of circumstantial and direct evidence were objectionable in that they read more like an exhortation, a plea excusing the evidence and quite nearly beseeching a verdict against the defendants, is without foundation.

APPEAL from a judgment of the Superior Court of Colusa County, and from an order denying a new trial. Ernest Weyand, Judge. Affirmed.

The facts are stated in the opinion of the court.

W. H. Carlin, Frank Freeman and Seth Millington, Sr., for Appellants.

U. S. Webb, Attorney-General, John H. Riordan, Deputy Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

LAWLOR, J.—The defendants were charged with the murder of one Ah Moy on August 29, 1917, near the town of Grimes, in Colusa County. They were jointly tried and convicted of murder in the first degree, with the punishment fixed at life imprisonment. A motion for a new trial was interposed and denied, whereupon the court pronounced judgment and sentence in accordance with the verdict. The appeal is from the judgment and from the order denying the motion for a new trial.

The judgment and order were reversed by the district court of appeal for the third appellate district, on the ground of the insufficiency of the evidence to support the verdict. Mr. Presiding Justice Chipman delivered the opinion of the court, which was concurred in by Mr. Justice Hart, who filed a separate opinion. Mr. Justice Burnett, in a separate opinion, dissented. The attorney-general petitioned for a hearing herein and it was granted, because we were not satisfied that the judgment and order should have been reversed. The opinion of the presiding justice fully and fairly states the evidence, and we shall, therefore, adopt that portion thereof and make it a part of this opinion. It reads as follows:

"A public highway runs from the town of Colusa to the town of Grimes, about thirteen miles southerly. About one mile north of Grimes, a by-road called Morris Lane, intersects this highway, coming in from the west. On August 29, 1917, between the hours of 5 and 6 o'clock P. M., deceased, Ah Moy, a Chinaman, was shot on his way from Grimes to the Morris ranch where he had been working as cook for several years. It was his habit after the noonday meal to go to Grimes, about three miles distant, on his bicycle to spend the afternoon with his countrymen, returning in time to prepare the evening meal. His course took him along Morris Lane to and along the Colusa-Grimes highway to the town of Grimes. All that was shown of his movements on the day of his death was that he left the Morris ranch about 1 o'clock P. M., and was found dead in the Morris Lane shortly after 6 o'clock P. M., lying in the road about two hundred yards from its intersection with said highway. Apparently he had been shot through the head while going west and fell with his bicycle across the road. There was no evidence of any struggle or indications of resistance on his part or of personal conflict between him and his assailant, nor was there evidence indicating robbery.

He had been shot and apparently had fallen dead from his wheel and lay where he had fallen without moving, as was testified to by Coroner McNary, who also testified that the wound was not probed and that there was no autopsy; that the course of the bullet was from a point above the left ear and out almost back of the right ear, but he could not say on which side of his head the bullet entered. He spoke of another wound on the left cheek bone which he discovered after washing the face. This wound was not described and it did not appear whether or not it was a gunshot wound. He also testified that the face was powder burned, but he gave no description of the markings. The coroner swore in a jury on the spot from among the assembled neighbors and after verdict rendered he put the body in a basket and took it to Colusa. This inquest was held at the scene of the homicide about the hour of 10, the night of August 29th.

"Wong Gow, one of the defendants, had lived in and around Colusa for many years. Tom Woo, the other defendant, had formerly lived in and around Oroville, and more recently, for some months, at Colusa. At the time of the homicide they had a lease of some broom-corn land across the river from Colusa a mile or two distant. Their claim and their testimony was that about 1 o'clock of the twenty-ninth day of August they left the garage in Colusa in an automobile belonging to Tom Woo and drove across the river on the Colusa bridge and spent the afternoon of that day on the east side of the river, returning to Colusa shortly before 6 o'clock; that they had supper about 6 P. M.; that Wong Gow went to Williams to hire help for harvesting their broom-corn and Tom Woo spent the evening reading the newspapers; that Wong Gow returned the next morning and learning that the sheriff wanted him he went to the office of the latter and was there arrested. Tom Woo had been taken in custody at his sleeping-room about 11 o'clock the night of August 29th, and was in jail when Wong Gow returned from Williams.

"Witness Londsen testified that he sold to Tom Woo the automobile he was using; that he, the witness, on the evening of August 29th, had gone to the postoffice for his mail and some stamps 'and was talking to Mr. Kline'; that it was shortly before 6 o'clock and the postoffice closed at 6; that he saw Tom Woo driving the car into the garage at that time and his recollection was that no one was with him in the car.

''Witness Kline testified that he was standing at the post-office ten or fifteen minutes before the office closed on August 29th, talking with Londsen, and saw Tom Woo driving his car into the garage; that he was acquainted with him and had sold him the car through Londsen's agency.

''Two witnesses were called in rebuttal by the prosecution who testified that the general reputation of Londsen in the community for truth, honesty, and integrity was bad.

''There was evidence, introduced by the prosecution, that defendants were seen and identified, both as to their persons and the automobile they were driving at different points along the Colusa-Grimes highway and at different hours after 2 o'clock P. M. of August 29th. Some of the witnesses speak of a third man as one of the party in the automobile at some of the points where they were seen. This third man is not accounted for and it is not shown that a third man was with the defendants when they arrived at Colusa. We will endeavor to present the evidence as shown by the record.

''Witness Charles Dunning was hauling hay in the vicinity and north of the Morris Lane on the afternoon of August 29th. He testified to having seen the defendants and a third man about 2 o'clock 'in Gene Vann's field' near a grove of trees about a mile north of Morris Lane. He testified that an Overland automobile was standing by the roadside near this grove. 'It was an old car—Overland car; the top was loose and shaken down some on the right-hand side.' He returned with a load of hay about 4 o'clock and saw them again 'pretty near at the same place. One of them was in the machine and the other was standing near the machine. They didn't seem to be doing anything in particular. There was a third man who was in or near the grove at the time. I should judge I was about a quarter of a mile from them when I saw them first and this last time I was about twenty feet from them.' After unloading his hay he returned, passing over the same road and going after another load of hay. He testified that he saw the defendants sitting in the car in the county road not far from where he first saw them; this was, as he testified, 'about a quarter to 5'; he went on to the Cole place for another load of hay and returned 'something after 5 o'clock—I don't know the exact time,' and he saw 'the car over in the Cole field but didn't see the defendants'; it had been moved farther down the road, pretty near the corner that leads to

Morris.'' He was asked to point on the map 'where they had moved down to.' The witness indicated a point he thought '150 yards from that corner. Q. And how long did they remain there in the neighborhood? A. I could not say. I observed them there about five or ten minutes and saw no more of them. Q. Approximately what time was that? A. Something after 5 o'clock—I don't know the exact time.'

"Witness Mahan testified that he left Grimes in an automobile fifteen minutes before 5 o'clock P. M., August 29th; that he passed an automobile standing in the Colusa-Grimes road about three hundred yards north of the junction of the Morris Lane; that he saw two men with the car, one of whom he afterward identified as Wong Gow; that he was on the first seat and the other man was working on the engine whom he could not identify; he saw no third man. Neither of these witnesses had personally known or had ever seen either of the defendants. Both of them testified to having based their identification upon such notice as they took of them passing them on the highway.

"Witness Staap, on the twenty-ninth day of August, was residing in the town of Sycamore, which is about six miles north of Grimes and five miles north of the Morris Lane. He testified that he saw the defendants and a third man in an automobile traveling past his residence on the Colusa-Grimes road between 12 and 2 o'clock of that day in the afternoon, going toward Grimes, and that about fifteen minutes before sunset he saw them passing on the road toward Colusa. The sun set on that day at 6:37 P. M. He testified that the automobile in which they were traveling was the same as the one he afterward identified in the garage at Colusa, which belonged to Tom Woo, 'by the top being smashed in.' He testified that he was standing in his dooryard about seventy-five or eighty feet from the road; that he had never seen either of the parties before; that there was nothing to attract his attention to them particularly; that the third man was on the back seat and the two defendants on the front seat; that it was not unusual to see automobiles passing; that the third man was dressed the same as the others, whose clothing he described. He was asked if he could not identify the third man if he saw him again as easily as he could the others, and answered he 'could not say as to that'; that the only way he had to identify the machine was by the top—'it was sagged down. Q. Is it

not a fact that you have seen many machines about that time—that was similar—had similar tops? A. Yes.' He described the third man as being 'a little taller' than the other two and 'a little more broad-shouldered.' Q. Well, isn't it a fact, if you met that man on the street now, you would not recognize him? A. Probably I would not. Q. You had just as good a look at him as at the other two? A. Yes, sir. . . . Q. When was it you made up your mind that they were the same ones in the automobile that day? What caused you to come to that conclusion? A. They looked like the same men that I saw in the car. . . . Is there not a greater similarity between two or three Chinamen than the same number of white men? A. Yes, I think so. Q. Now, Mr. Staap, is it not a fact that you heard of the killing of Ah Moy and remembered seeing three Chinamen pass by your place there twice and come up the road here, and you thought they were the ones in the machine? A. Yes, sir. Q. But at that time— at the preliminary and now, the best you can say would be that you noticed the similarity, and you think they were the same men? A. I think they were the men in the machine that I saw.'

"Witness Heryford testified that he was employed as a jitney driver and lived at Colusa; that on August 29th he left Colusa in a Ford machine about 6 o'clock P. M. 'going to the sugar camp this side of Grimes'; that he met defendants traveling in an Overland machine going north toward Colusa, defendant Wong Gow driving; that he had seen Tom Woo around town for the past six months and 'had seen him driving that machine before,' and that it was his machine and is the same the sheriff took into custody and is an exhibit in the case; that where he met defendants was about three miles north of Grimes; that there were three men in the machine, 'two on the front seat and one behind'; that he had known Wong Gow for two or three years. On cross-examination he testified that 'it must have been half-past 6' when he met defendants, as he left Colusa about 6 and it took him about half an hour to reach the point where he met defendants; that they were traveling at twenty-five or thirty miles an hour and he at about the same rate. His attention was called to his testimony at a former trial at which time he testified that he recognized only one man, Tom Woo, and that two were in the rear seat. 'Q. Did you testify that way at that time?

A. Yes, sir.   Q. Was that correct?   A. I guess it was. . . .
Q. Why did you say this time you recognized two men in the
machine, and say at the preliminary examination that you
recognized one man?   A. I forgot, I guess.'

"The foregoing comprises the direct testimony tending to
establish the fact that defendants were in the vicinity where
the homicide occurred during the afternoon of August 29th.
It does not definitely appear at what time deceased met his
death.   Witness Morris, at whose ranch he worked, testified
that he, witness, left his house at about the hour of 4 o'clock
on August 29th, going by the Morris Lane road; that he saw
an automobile in the lane approaching him, but it turned
around some distance from him, and proceeded down the lane
to the Colusa-Grimes road and turned north; that there were
three men in it but he did not know whether they were China-
men or white men; that he drove on in his automobile to
Grimes, where he remained an hour or more and about 5
o'clock left Grimes, returning to his home by the same road;
that he saw an automobile up the Colusa road beyond the
junction of the Morris Lane; it was not moving and there were
three men with it; one had got out; the machine was faced
north; he thought it might be the same he had seen before but
it was too far away to tell much about it; he went on home
and at 6 o'clock received notice by telephone of Ah Moy's
death.

"Witness Simpkins, a laborer on the Morris ranch, left the
ranch by automobile, as he testified, by the Morris Lane road
on his way to Colusa; that about 6 o'clock P. M. he found the
body of the deceased in the Morris Lane; he walked around
the body, saw that the man was dead and went to Grimes and
notified Morris and telephoned the coroner at Colusa, went on
to Colusa and returned with the coroner to where the body
lay.

"Witness Beckley testified that on August 29th he was liv-
ing at Grimes, 'about three-fourths of a mile in an arrow line
from the junction of the Morris Lane with the Grimes-Colusa
road.   On the twenty-ninth day of August, 1917, between a
quarter to 6 o'clock and 6 o'clock P. M., I heard a couple of
gunshots.   I was walking and I heard one shot and then I
took about one step when I heard another.   They were pretty
close together.   They sounded from up the Morris road.'

"The testimony is next addressed to certain facts and circumstances discovered at and near the place where the body was found. Soon after witness Simpkins discovered the body it became known in the vicinity and a number of neighbors came to the scene in automobiles. When Simpkins first was at the place and walked around the body he saw no tracks that attracted his attention. Later when he returned with the coroner he testified, as did others, to a man's track traceable from the body to a point easterly toward the Colusa-Grimes road about 'thirty steps' distant from the body and where an automobile coming into the Morris Lane had turned around and gone back to the Colusa-Grimes road. These tracks were not traceable beyond where this turn was made and there were no corresponding or other tracks traceable to the body. Some one of the numerous persons congregated there discovered these tracks and drew a circle around two or three of them to preserve their identity. Witnesses testified to following these tracks from the place where the body had lain to the point where an automobile had turned around and that these tracks grew wider apart as they approached the automobile, the inference being that whoever made them quickened his footsteps after leaving the body. Sheriff Stanton took into his possession Tom Woo's automobile on the morning of August 30th. He testified that he took it to the scene of the homicide that morning and had it driven along the Morris Lane near to the point where the automobile had turned, above referred to; he backed and made a turn as nearly parallel as he could with the tracks found in the road. He was asked how the two sets of tracks compared and answered: 'They are identical.' He also took three measurements of the footprints leading away from where the body of the deceased had lain—one of them a footprint that had 'been circled around' and two not thus preserved. He found a stick by the roadside and marked on it the length of the footprint and length and width of the heel. He later took from his feet the shoes Wong Gow was wearing. He was not permitted to answer the question as to how his measurements marked on the stick corresponded with the measurements of the shoes, but the broken pieces of the stick and the shoes were admitted as exhibits. On cross-examination he explained that the dust was an inch or two deep and 'was a dust that would leave a distinct track.' His method of procedure is thus described: 'Q. Then when you

measured the other tracks you guessed as to whether they were the same or not? A. I measured them about the same, as I recall. I just got the length and width of them—as you have stated, I would have to guess at it, to a certain degree or extent, that is by pushing it down and then getting it, by laying it where the impression was made. Q. Well, by finding the length of it and taking this here [indicating the stick] you got the first impression? A. Yes, sir. Q. And then laid it on top of the dust and guessed as to what would be the width of the heel of the track? A. Yes, you can get it correctly, if you have to guess. Yes, I guess I did. Q. Oh, did you say the dust, it was much deeper at the point where you made the first impression than the last? A. That would be a guess, too. Q. Now, then, you did the same way in getting the width of the heel? A. Yes, sir. Q. And the length of the heel? A. Yes, sir. Well, I don't know whether I did or not, but I presume—you see, I used my knife there in marking it. [Indicating a place on the stick.] Q. After getting the length of the heel, you would set it down in measuring the full length of the shoe? A. I guess I did that. Q. But you don't recall now just what part of the performance you did do? A. No. Q. In other words, you guessed the best way you could? A. Yes, sir. Q. If dirt fell into the tracks, or if anything moved the dirt you would still have to make a greater guess, as to length, or how much dirt fell in? A. It might be. Q. And that was true? A. I presume so. Q. It doesn't make very much difference in the width of the shoe to make a difference in the tracks, does it? A. No.' He testified that the footprints he measured were probably fifteen steps—forty-five or fifty feet from where the body had lain. 'Q. And all tracks between those two points were all obliterated? A. I didn't find any. Q. You were looking for them? A. Yes.' He testified that he did not take Tom Woo's shoes or measure them 'because he didn't have any on when arrested.' Referring to Wong Gow's shoes, he testified that he thought he measured them by the stick before he took them off his feet. 'Q. Well, after you took them off, did you take them down and fit them into the tracks? A. No. Q. Why? A. I didn't think it would be possible to get an accurate impression, from the tracks—that the tracks by that time would have been obliterated. Q. They were all right when you made the measurements? A. Yes, but there

was a great deal of travel on the road there. It would be of no use. Q. Didn't you try to find out whether it would be of any use or not? A. No.' There was no evidence tending to show whence the person came who made these tracks; there were no tracks traceable from any point to the body. There was evidence that on the north side of the Morris Lane at that point the weeds next to the fence and near the traveled part of the road were two or three feet high. We presume the purpose of this evidence was to show that a man might have concealed himself in this cover and have shot the deceased from that point. There was also evidence that the tracks of an automobile similar to those described by Sheriff Stanton were seen some distance west where an automobile had apparently made a similar turn as if having gone into and out of the Morris Lane. There was evidence that the automobile tracks referred to by the sheriff could be traced easterly and to the junction with the Colusa-Grimes road where they apparently turned north toward Colusa but were then obliterated. Several persons witnessed the experiments made by Sheriff Stanton with Tom Woo's automobile. The witnesses did not agree as to the kind and condition of the tires on the machine making the tracks. Witness Ainger testified: 'The two front tires were plain tread and the two rear tires non-skid.' Witness Clip was asked whether he noted the impressions or markings by the tires of the automobile making this turn. 'Q. What kind were they? A. The left tire had holes in the tire marking the road. Q. Was that the front or rear? A. Hind tire. Q. And how about the right hind tire? A. Well, it left a kind of flat mark—the same as a wagon, only had triangles on it. Q. How about the front tire? A. It was smooth tire.' Witness Miller testified that he noticed particularly the markings on the ground. 'Q. What were they? A. One was an old tire and the other a new. Q. Which was which? A. The left one was a new one and the right was an old one.' Witness Stanton thus described the tires which made the tracks: 'The two front tires were smooth tread; the right hind tire was a Savage grip tire, and was worn pretty smooth. The left hind wheel made a distinct tread; a track like it was practically a new tire.' Our attention has not been called to any description in the record of the tires on the Tom Woo car. It was made an exhibit and the jury visited the garage where it had been kept. Sheriff Stan-

ton testified that it was in the same condition as when taken into his possession.''

1. The principal question on this appeal is whether the evidence is sufficient to justify the verdict against the appellants. It is the position of their counsel ''that giving to the testimony introduced on behalf of the prosecution all the weight to which it can be in any way entitled the case falls short of proving the guilt of the defendants to that degree of certainty which is required.''

In passing upon this question we will not attempt to determine the weight of the evidence, but will decide only whether upon the face of the evidence it can be held that sufficient facts could not have been found by the jury to warrant the inference of guilt. [1] For it is the function of the jury in the first instance, and of the trial court after verdict, to determine what facts are established by the evidence, and before the verdict of the jury, which has been approved by the trial court, can be set aside on appeal upon the ground we are discussing it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below.

[2] The determination of a charge in a criminal case involves proof of two distinct propositions: First, that the offense charged was committed, and, second, that it was perpetrated by the person or persons accused thereof.

In this case there can be no doubt of the first proposition, for it is clear that Ah Moy was the victim of a cold-blooded assassination; that the details were worked out beforehand, and that the plan was to strike him down as he, according to his daily habit, made his way along Morris Lane to the ranch where he was employed to prepare the evening meal.

Did these defendants commit or participate in the commission of the murder? What facts can we say the jury could have resolved from the evidence in order to justify the inference of guilt? [3] We must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether such facts are sufficient to support the verdict.

Among the more important facts which we must regard as having been found by the jury are the following: That the appellants were seen by several witnesses loitering and waiting in the neighborhood of Morris Lane for several hours during

the afternoon of August 29th until a short time before the
murder took place, and were seen by two witnesses driving
along the highway in the Overland at the rate of twenty-five
or thirty miles an hour toward Colusa shortly afterward; that
while on the highway the appellants tried to .conceal their
identity from the witness Dunning, who passed them four
times during the afternoon; that the Overland which figures
in the evidence was owned by the defendants, and that it was
recognized at different times that afternoon in that vicinity
by several witnesses; that the machine which the witness Mor-
ris saw about 4 o'clock in Morris Lane and the one he observed
on the highway at about 5 o'clock were identical, and although
Morris' testimony was not definite, the jury upon the entire
evidence may have decided that on each occasion it was occu-
pied by appellants; that the turning back of the machine in
Morris Lane without any apparent reason could have been
regarded by the jury as having been done to avoid meeting
Morris and that it was, therefore, a suspicious circumstance,
as may also have been the incident of the automobile making
two trips into Morris Lane without continuing west either
time beyond the spot where the murder was committed; that,
since the record does not show what, if any, tests the jury may
have made in connection with the testimony of Sheriff Stanton
and the shoes and measuring-stick admitted in evidence touch-
ing the footprints traceable from near where the dead body
was found to the automobile tracks, we would be going outside
of our province if we held that the jury could not have found
that they were made by Wong Gow; that the *alibi* was a fabri-
cation; that the appellants gave perjured testimony, and that
they suborned witnesses in the attempted corroboration of
their *alibi*.   Apart from the perjured testimony the jury may
have found additional support for the inference of guilt in
the manner and conduct of the appellants on the witness-
stand.

It is insisted that the evidence considered in the light most
favorable to the prosecution shows only two incriminating
circumstances having any tendency whatever to connect the
appellants with the murder—that they were seen loitering and
waiting in the vicinity all afternoon, and that their *alibi* was
fabricated.   This position ignores other incriminating facts,
which, as we have pointed out, the jury may have found—the
attempt of the appellants to hide their identity, the automo-

bile tracks in Morris Lane showing that the car had been driven in there twice, the footprints, the turning back of the machine at the approach of Morris, and being seen on the highway in the automobile going toward Colusa after the murder.

[4] In our opinion the facts which we have indicated could have been found by the jury are sufficient to sustain the verdict. It is the law that neither mere opportunity to commit a crime, nor perjured testimony is sufficient to support a verdict of guilty. Nor are false statements or suspicious circumstances sufficient. It may be conceded that no one of the facts summarized would, if standing alone, be sufficient to uphold. the verdict, but when all the circumstances which the jury may have resolved from the evidence are considered together, it cannot be held on appeal that they are not sufficient to warrant an inference of guilt.

Appellants contend that the evidence is insufficient, particularly because of the absence of proof of motive. It is true the prosecution did not offer such proof. But, as has been declared in many cases, it is not necessary to establish a motive for the perpetration of an offense. A presumption of innocence arises in favor of a person accused of crime. This presumption is disputable and may be overcome by other evidence. The presence of a motive is evidence tending to prove guilt, for the reason that its tendency is to rebut the presumption of innocence. On the other hand, absence of motive tends to support the presumption of innocence. [5] But the presence or absence of motive is essentially a question of fact, and, like any other fact, is not necessary to be proved if the crime can otherwise be established by sufficient competent evidence. So, in this case, the absence of proof of motive is a fact to be reckoned on the side of innocence, but if the proof of guilt is nevertheless sufficient to overthrow the presumption of innocence, the appellants must stand convicted, notwithstanding no motive has been shown.

It is proper to state that in some instances the proof was not complete. For instance, the court did not allow Sheriff Stanton to testify as to whether the shoes of Wong Gow corresponded in size to the measurements of the footprints as they were shown on the stick; the coroner testified that there were powder-marks on Ah Moy's face, but the point was not pursued further; and, assuming that the footprints of Wong

Gow were traced from the place where Ah Moy was killed to the automobile tracks, it was not shown that there were any footprints leading to the dead body. But, in spite of these discrepancies in the proof, we think the jury nevertheless could have found sufficient facts to be satisfied beyond a reasonable doubt that the appellants were guilty of the murder.

The part which the unidentified third man played in the proceedings that afternoon remains a mystery, and we shall not consider whether he was implicated in the crime or what effect, if any, the evidence on this point may have had on the jury in reaching the verdict.

2. It is urged that the court erred in allowing the prosecution to impeach the testimony of the appellants over their objection. They testified on direct examination that they left Colusa at about 1 o'clock and went to the Jap camp and remained there until about 6 o'clock. On cross-examination Tom Woo was asked if he did not, on the evening of the 29th of August, after he was arrested and lodged in the county jail, in a conversation with Deputy Sheriff Crayton, no one else being present, state to Mr. Crayton that he, Tom Woo, went to the garage at about fifteen minutes to 12 on that day and tried to get his car; that Mr. Martin was working on the car and that he fixed it up so it would run, ''and you left the garage at about thirty minutes past 12 o'clock, and got to the Jap camp at 1 o'clock? .Did you make that statement?'' To which question the defendant answered: ''I could not remember; maybe I did.'' Mr. King, the assistant district attorney, asked of the defendant the further question: ''Do you remember in the fore part of September, a few days after you were arrested, there at the county jail, of having a conversation with Mr. Scoggins, Mr. Crayton and myself? . . . Do you remember having a conversation with those parties named and yourself?'' To which he replied: ''Yes, sir; I did.'' Mr. King then asked the further question: ''I will ask you, in the fore part of September, where you were detained in the county jail, yourself, Mr. Scoggins, Mr. Stanton, and myself being present, on that occasion and that place, if in the conversation that occurred there, you didn't state that on the twenty-ninth day of August you left Colusa and went to the Jap camp, saw Fuyikawa and had a talk with him with regard to cutting corn? That you went out in the cornfield and had a talk with him in regard to cutting corn at that time? Did

you make that statement then and there at that time?" To which he replied: "Maybe I did." He was then asked: "If you made that statement, was it true?" And he answered: "I could not say; maybe I did and maybe I didn't. Of course I don't remember now." Again he was asked: "If you made that statement at that time and place, was that statement true or false?" To which he answered: "I could not say." After the defense rested Sheriff Stanton and the deputy sheriff testified over the objection of the appellants that the statements embraced in the foundation testimony were made by Tom Woo. The point to the objection was that Tom Woo had not as a matter of fact denied on cross-examination that he made the statement; that there was in fact no material inconsistency between the statements sought to be proved and the testimony of the appellants at the trial.

Questions of similar import were put to Wong Gow on cross-examination with substantially the same result, the witness answering four or five times: "I don't remember," and in one instance saying: "Maybe I did." This was supplemented by a statement: "I was in jail. I was all mixed up." Testimony tending to impeach Wong Gow was allowed over similar objections.

[6] The testimony of the defendants as to their movements that afternoon was clearly contradictory of the extrajudicial statements imputed to them. The inquiry was therefore material, and since it is plain from the record that the statements were neither admitted nor denied, the prosecution was entitled to impeach the appellants. (7 Ency. of Evidence, 71.)

3. Appellants complain that the use of the words "legal and competent," as they appear in the following sentence taken from instruction I, is objectionable: "And I will say to you that the evidence which has been received in this case is legal and competent, and if it is, in your mind, of such a character as to exclude every reasonable theory or hypothesis other than that of defendants' guilt beyond a reasonable doubt, then and in that event it should be given the same weight by you as would direct evidence of the fact alleged." The position of appellants is thus stated: "Theoretically, of course, the statement might be defended, but when addressed to a jury of laymen, it is trenching upon questions of fact.

The mere admission of the testimony in evidence stamps it as competent and legal from a legal standpoint. Then why turn to the jury and tell them that this flimsy unsubstantial thing called 'circumstantial evidence,' as it appears in this case, was 'legal and competent?' To the ordinary jury this was tantamount to saying 'this evidence is sufficient' and you can't get away from it.''

[7] We do not think the words ''legal and competent'' in the sense in which they are employed are objectionable, and clearly they carry no intimation to the jury that the court deemed the evidence, because it was ''legal and competent,'' sufficient to convict. The point to the instruction is that the evidence, circumstantial in its nature, being ''legal and competent,'' that is to say, proper evidence for the jury to consider, if found *by the jury* to be sufficient ''to exclude every reasonable theory or hypothesis other than that of the defendants' guilt beyond a reasonable doubt,'' it should be accepted and acted upon just as if it were direct evidence having the same probative effect.

[8] It is contended that instructions II, III, and IV are objectionable in that ''they read more like an exhortation, a plea excusing the evidence and quite nearly beseeching a verdict against the defendants.'' This criticism is entirely without foundation. Instruction II, after stating that all the evidence was circumstantial, proceeds to explain why, because of the conditions under which crimes are sometimes committed, circumstantial evidence must be relied upon. In instruction III the court directs the jury to carefully examine the evidence and determine what circumstances have been proved to their satisfaction beyond a reasonable doubt, and then to consider what conclusion as to the guilt or innocence of the defendants should be drawn therefrom, and if such conclusion point to guilt beyond a reasonable doubt, they should so find ''notwithstanding the fact that you might be more fully satisfied if you had the testimony of eye-witnesses.'' The court further instructed the jury that in cases supported by circumstantial evidence, either in whole or in part, as in cases supported by direct testimony, the jury are required only to be satisfied as to guilt beyond a reasonable doubt.

Instruction IV is of the same general tenor as the other instructions treating of circumstantial and direct evidence.

We think none of them is open to the objections made by appellants.

The judgment and order are affirmed.

Shaw, J., Lennon, J., Melvin, J., Wilbur, J., Olney, J., and Angellotti, C. J., concurred.