[Crim. No. 1476.   Second Appellate District, Division One.—September 27, 1927.]

THE PEOPLE, Respondent, v. AGNES THORNTON, Appellant.

Laurence D. Carter for Appellant.

U. S. Webb, Attorney-General, and J. L. Flynn, Deputy Attorney-General, for Respondent.

SHAW, J., *pro tem.*—The appellant, Mrs. Agnes Thornton, was tried upon an information containing two counts, the first charging her and one Bobby Clark with arson, and the second charging the same persons with burning insured property with intent to defraud an insurance company. The arson charged in the first count was the burning of a dwelling-house at 3615 Paloma Street, in the city of Los Angeles, and the second count charged the burning of the same dwelling-house and the contents thereof, all upon the twenty-seventh day of July, 1926. At the trial the information was dismissed as to Bobby Clark and she testified for the prosecution. Appellant was convicted upon both counts, the verdict specifying that the arson was of the first degree, and she appeals from the judgment. No briefs have been filed by either side, and we are dependent for information as to the grounds of appeal upon the oral argument and appellant's written application to the trial court for a transcript.

The evidence shows that appellant was the owner of the house referred to in the information, and of its contents, and that it was occupied as a residence by appellant, by Bobby Clark, and by appellant's two year old grandson, and at times by other persons. There is no question that a fire occurred at this house, to which the Los Angeles fire department was called early in the morning of Tuesday, July 27, 1926.

Several officers of the fire department were called as witnesses, and from their testimony it appeared that the first fire unit arrived at the house at 5:09 A. M. The fireman who first arrived saw smoke coming from the front part of the house, the front door open and a man standing in the door wth a garden hose. He looked in and saw in the living-room a davenport and a chair, partly consumed and still burning. Within a few minutes several firemen arrived and examined the building carefully, and from their testimony the following facts appear: Fires or preparations for fire were found in five different places, of which only two were burning, and none of them had any connection with any other. In the living-room the rug had been burned

through and the floor deeply charred. In the back bedroom a fire was burning and had been burning for some time in a closet. This fire had charred the walls and the door on the inside of the closet, burned through the floor at the back and up through the ceiling, and had burned some clothes except a few fragments remaining on the floor. A screen at the bottom of the kitchen cooler had been broken loose and some newspapers thrust down through the opening, and these were found partly burned. Testifying from their experience as firemen and the appearance of the ashes, two witnesses said these papers had been burned from six to twelve hours before their examination was made. Two lath ventilators covering openings to the space under the house had been torn off, and piles of paper had been placed under the house opposite them. One of these piles, which was under the back bedroom, had been partly burned; the other pile, which was under the front bedroom, had not been burned, but one witness detected the odor of coal-oil on it. None of the fires under the house had taken effect upon the building. Two of these witnesses also saw the remains of a fire in the dining-room, where the carpet had been charred, and one of them saw a burned match and detected a strong odor of gasoline or coal-oil at this point. One of the firemen, who arrived at 5:25 A. M., went to the front bedroom and found there appellant, who was in bed, Bobby Clark, and a small boy about two years old. A neighbor who left home for work about 4:30 A. M. testified that as he went out of the house he saw a dim light in the living-room of appellant's house, but did not see or smell any smoke or fire, and the light did not flicker.

Thomas S. Brown testified that he was an insurance broker for Employers' Fire Insurance Company of Boston, Massachusetts; that on July 23 or 24, 1926, he went to appellant's house at 3615 Paloma Street, at the request of a Mr. Tate, and spoke with appellant, who said she wanted insurance on the house, and after some discussion, directed him to write a policy of $5,000 on the house, $1,000 on the contents, and $150 on the garage. She told him she had no ready money to pay the premium, but did not owe any money. He wrote the policy accordingly, and it was mailed to appellant on July 27th and received by her after the fire. The policy was introduced in evidence and proved to

be a fire insurance policy dated July 22, 1926. Brown explained this date by saying that the policy was written to cover the property from the date of the application for insurance, which was before he inspected the property. The issuance of another policy on the house, with loss payable to a mortgage company, and payment of the premium thereon by that company, were also proved, but it was not certainly shown that appellant had knowledge of it.

Bobby Clark testified that she had no interest in the house or its contents or anything insured therein; that at the time of the fire she lived there with appellant and had lived there for a month or more, doing the work and caring for appellant, who was sick part of the time; that appellant's son and her grandson also lived there; that on the Sunday before the fire appellant suggested to the witness that they burn the house in order to get money to get the boy (meaning her son) out of trouble and pay debts; and that appellant directed the witness to go the next day and get some gasoline. This witness also testified that she was present at the placing of the insurance policy for $6,150 on the place with Mr. Brown on the Friday before the fire; that on Monday, July 26th, she got some gasoline and brought it to the house; that about 9 P. M. on Monday night the witness put some papers, which appellant handed to her for that purpose, under the house at the places where they were found by the firemen, and poured gasoline on them; that about 11 P. M. of that night appellant said it was time to light the fires, and the witness lighted the fires under the rear bedroom and the kitchen cooler, but did not light the papers she had put under the front bedroom, where she, appellant, and appellant's grandson slept that night; that appellant started the other fires; that later the fires did not seem to be burning and appellant got up twice, took an umbrella and went into the front room to start the fire so it would blaze up; that about daylight the witness opened the door from the bedroom into the living-room and found the latter full of smoke, and becoming alarmed, got out of a bedroom window and went next door to call the fire department. Bobby Clark also testified that under appellant's direction she wrote two letters, charred the edges of their envelopes and addressed and mailed them to appellant, who told the witness the charred edges were a sign of arson.

The first of these she mailed about two weeks before the fire, and the second was written on the Sunday before, and received by appellant on July 27th.

Appellant herself took the stand, denying her guilt in general and Bobby Clark's testimony in particular, and stated that she had not the least idea how the fire started; that she and Bobby Clark and her grandson were in the house, and her grandson was in bed with her all the night of the fire; that she heard no one in the house but Bobby Clafk, but heard a noise outside, on that night.

■ Appellant contends that as she was the owner of the house she could not be guilty of arson in burning her own property, and also that under the circumstances shown by the foregoing evidence she and Bobby Clark were equally guilty and, as held in *People* v. *Abrams,* 174 Cal. 172 [162 Pac. 395], in order to make a case of arson in the first degree the building must be occupied by someone other than the persons concerned in the crime. These arguments are sufficiently answered by a reference to sections 452 and 454 of the Penal Code, and a brief consideration of the testimony already stated. From this testimony the jury must have found that appellant's grandson spent the night in the house, and that the fires were of incendiary origin and were started at some time during the night and while the boy was in the house. These conclusions may be reached without considering the testimony of Bobby Clark, and make out a case of arson.

■ Appellant also argues that Bobby Clark was an accomplice, and that her testimony was not corroborated as required by section 1111 of the Penal Code. There can be no doubt that Bobby Clark was an accomplice as defined by this section. As we have already stated, the commission of the offense charged in the first count by some person is sufficiently shown without considering her testimony. Upon the second count an intent to defraud or prejudice an insurance company is a material element of the offense. It has been held that such intent may be inferred from the facts that the defendant owned the property burned, that he burned it, and that at the time of burning it was insured against loss by fire (*People* v. *Vasalo,* 120 Cal. 168 [52 Pac. 305]), to which, according to a later decision, must be added the fact that defendant knew of the insurance, before the inference can

be drawn (*People* v. *Rose*, 38 Cal. App. 493 [176 Pac. 694]). The evidence we have already stated other than that of Bobby Clark shows that the fire was of incendiary origin; that the property was owned by and insured in the name of appellant, and that she knew of the insurance, but does not show that she burned the building; and it is therefore insufficient as a basis for any inference of intent to defraud the insurance company. There is, however, other evidence in the case. Since the fact which is lacking on this point would also tend to corroborate Bobby Clark on both counts by showing defendant's connection with the fire, these two points may be discussed together.

The evidence corroborating Bobby Clark is not strong, but there are several circumstances tending to connect appellant with the commission of the offense. Mrs. Sadie Ford lived next door to appellant, and testified that before the fire department arrived she went to turn the hose on the house and appellant forbade her to do so. Norman A. Danskin, an investigator for the fire department, testified that he had a conversation with appellant on the morning of the fire, in which she said she had no idea what caused the fire, but that no one had been in the building during the night other than herself, her grandson, and Bobby Clark; that she was a very sick woman and had not been up during the night; that she was the owner of the property; that her insurance had run out about six months before and she had renewed it because she had received a threatening letter about three weeks before, but she was sure the policy was in effect; that one end of this letter was burned off and she was under the impression that someone was going to burn the house and called an insurance man, whose name and address she did not know, the next day after receiving the letter.

Paul T. Wolfe, another investigator for the fire department, testified to several talks with appellant. The first one occurred about 9 A. M. of July 27th, at which appellant said she had slept in the house that night, but heard nothing unusual and did not know how the fire started; that she had not been up during the night, as the doctor had given her something to make her sleep, and that she had had this doctor's services for three weeks, but did not know his name. Just after this a Dr. Robinson came into the room,

and in answer to questions by Wolfe said in appellant's presence that he, the doctor, had given appellant nothing to make her sleep, but had given her some quinine and atropin, and that appellant was able to get up without any bad effect if she did not stay on her feet any considerable length of time, to all of which appellant made no reply or objection. At this conversation appellant also said to Wolfe that her insurance on the building and contents had run out several months previous and she had not renewed it; that there were no debts against the place; that she owed a few little bills, but they did not amount to anything; that she had received a threatening letter, and that enemies had started the fire, but she did not name anybody, though asked to do so. On July 28th, Wolfe had another talk with appellant, in which appellant said she had mentioned insurance to a friend named Tate, who would send an insurance man to see her or place the insurance himself, but she had never heard from Tate or the insurance company and did not know whether any insurance was placed. She also told Wolfe she had received another black hand letter and gave it to him. He tried to read it, but could not on account of the smallness of the writing, and Bobby Clark stood behind him and read it. Wolfe also got the first threatening letter from appellant's attorney.

These letters were introduced in evidence. The first was dated July 5, 1926, and the second July ——, 1926, and both were signed "Revenge." The first letter threatened death to appellant, and the second, while rather vague, can be construed as referring to the fire and threatening further mischief. Testimony was given by a handwriting expert that he had compared the handwriting in these two letters with specimens written by Bobby Clark, and that both were written by the same person.

Wolfe further testified that on the nights of July 29th and 30th he watched the house from 8 to 12 o'clock to see if anyone was molesting the place, and saw no one; that about midnight on the second night he went to appellant's house and knocked at the door and appellant answered, when he told her not to be alarmed as he was watching the house; that previous to that everything was as still as could be, but after he made this statement appellant seemed to be in considerable pain and he heard her groaning a considerable

part of the time; that he stayed there about thirty minutes after seeing appellant. He further testified that on August 15th he met appellant at the office of an insurance broker and asked her what she was doing there, and asked her if she had any insurance, to which she replied, "No." He then stepped out of the office and appellant followed him into the hall and said, "I lied to you in there, I have insurance; just a few hundred dollars, one thousand dollars on my furniture." On September 7th, Wolfe again saw appellant at her house, asked her if she had found any more insurance and she said, "No." He asked her if she had a lot of liens against the place, which she at first denied, but then admitted there were a considerable number of liens secured against the property, and that the same was true of the furniture.

■ From the evidence the jury could have found that a fire was built but not lighted under the room occupied by appellant; that she forbade a neighbor to attempt to put the fire out; that appellant made false statements in order to show that she could not have been out of bed on the night of the fire; that she stated to investigators that she did not know whether she had any insurance and had not seen an insurance man, although in fact she had seen one and placed insurance with him three or four days before; that when she learned the house was being watched by a fire department investigator she began to groan and act sick, although she had not done so before; that she denied having any debts or encumbrances on the house, but later admitted them; that she referred to the threatening letters for an explanation of her effort to get insurance, although these letters had been written by her household assistant, Bobby Clark; that she gave the same explanation to the investigator of the meaning of the burned edges of the letters as, according to Bobby Clark's testimony, she had given to the latter; that although attributing the fire to enemies appellant was unable to name or identify them; that she was in fact in debt and in need of money; and that these various false statements were made in an attempt to mislead the investigator and divert suspicion from herself. Perhaps no one of these facts, if standing alone, would be sufficient to uphold the verdict, but taking them all together we are unable to say that there is no substantial evidence

tending to connect appellant with the commission of the offense charged. (*People* v. *Woo,* 181 Cal. 315, 328 [184 Pac. 389].)

Appellant also claimed upon the argument that the court committed error in admitting in evidence the two letters above referred to. We think they were material in connection with appellant's conduct in reference to them, but appellant is in no position to raise this point now, for no objection was made to these letters at the trial.

The foregoing are all the points made in support of the appeal at the argument, but in view of the fact that no briefs were filed and that appellant's attorney stated at the argument that he was not well prepared therefor because he had been expecting that other counsel would be substituted for him in this court, we have examined the entire record and find no prejudicial error.

The judgment appealed from is affirmed.

Conrey, P. J., and Houser, J., concurred.