[Crim. No. 2447. Second Appellate District, Division Two.—March 23, 1934.]

THE PEOPLE, Respondent, v. LOGAN LEWIS, Appellant.

Tyler & Jefferson, Willis O. Tyler and Edwin L. Jefferson for Appellant.

U. S. Webb, Attorney-General, and John L. Flynn, Deputy Attorney-General, for Respondent.

HAHN, J., *pro tem.*—Appellant was charged by information filed by the district attorney of Los Angeles County with the crime of murder in count one, and in count two with the crime of wilful and malicious burning of property. The jury returned verdicts of guilty on each count, fixing punishment by life imprisonment on the murder charge.

While the notice of appeal does not specify the judgment from which the appeal is taken, appellant's brief is confined altogether to a discussion of the murder charge. The only ground urged for a reversal of the judgment is the broad general assertion that the evidence does not warrant the verdict of conviction of murder found against him.

On Wednesday night, December 7, 1932, a fire which was first observed about 11:30 P. M. destroyed a small frame building located in the rear of a church for persons of African descent on 112th Street in the city of Los Angeles. The building was used as a recreation hall for the church people and particularly by a group of the women, known as "Willing Workers", whose main purpose was to make over old clothing to be distributed to the needy. At the time of the fire there was a quantity of such clothing in a closet in the building. After the fire was extinguished the badly charred body of Winnie Lewis, wife of defendant, was found in the ruins. Her forearms were half consumed by the fire, as were her legs below the knees. Both arms were dislocated at the elbows and both legs dislocated at the knees.

The frontal bone on her skull was crushed in and both anterior fossae of her skull were fractured. That the deceased was the victim of a violent assault which caused her death and that her body was deposited or left in the building, which was set on fire to cover up the foul deed, may well have been inferred by the jury from the evidence in the case.

The record discloses a marked conflict on certain material points between the story of events as related by the defendant and the evidence produced by the prosecution. Hence, in constructing the story of the events bearing upon the homicide for the purpose of considering the question before us, it is proper and indeed necessary that the evidence and inferences that tend to support the verdict be adopted rather than the story told by defendant. In this connection it may be observed that the defendant was so thoroughly impeached on a number of vital matters that the jury was justified in not only disregarding his story but in believing that he had something to cover up.

The defendant lived with his wife and her sister at 1256 East 33d Street, Los Angeles. He was employed as night operator of an elevator at the Hall of Records and also as janitor at two offices near 12th and Maple Streets. He usually went on duty at the Hall of Records at 12 o'clock midnight and was relieved about 7:30 in the morning. It was his custom to go at once to attend to his janitor work at 12th and Maple, which work he completed about 9 o'clock, after which he usually returned to his home.

On Monday morning, December 5, 1932, defendant left his home for work about 4 o'clock A. M., he being required to report for duty on Monday morning at 5 o'clock instead of the earlier hour of midnight, as on other days. After working about an hour, giving sickness as an excuse for quitting earlier than his usual time, he left the Hall of Records and went to 12th and Maple Streets, where he was accustomed to do some janitor work each morning. While there he was observed by one of the clerks, a Mrs. Grantham. Lewis was next seen with his wife in his automobile on Compton Avenue near 83d Street, driving in the direction of the church where the fire occurred the following Wednesday night. About 10 o'clock he and his wife called to see a friend, one Mrs. Cole, who had been ill for some

time. Her home was situate not far from the church in question, of which Lewis had formerly been the pastor and of which at this time both he and his wife were active members. Winnie Lewis was last seen alive when, with her husband, she left Mrs. Cole's home Monday morning between 10 and 11 o'clock.

About 11 o'clock defendant called his home by telephone and stated to his sister-in-law that he would be home soon. He arrived home some time between 1 and 2 o'clock and ate his lunch. · His sister-in-law stated to him that his wife had left home about 9 o'clock that morning and had not returned. Defendant then left the house, went to the home of a friend, one Harry Miles, and reported his wife missing. He and Miles went to the police station, where they arrived shortly before 2 o'clock, defendant saying to the officer in charge, "I want to report my wife as a missing person." When the officer suggested that her absence from home for such a short period would not justify the conclusion that she was missing, defendant replied, "Well, I believe my wife has met with foul play." He later repeated this statement to the officer and when asked for his reason for so believing told the latter that on the previous Saturday morning his wife had found a threatening letter in their mail-box.

The story of the letter, as told by the sister-in-law, is briefly as follows: On Saturday morning previous to the disappearance of Mrs. Lewis, while she and Mrs. Lewis were in the house, defendant came in. "He was very excited. His voice was very excited. He said 'Come here, Babe [he called his wife Babe], see what this letter is. See this letter.'" The letter was sealed, addressed to L. Lewis and had a three cent stamp attached which had no cancellation marks on it. On a sheet of cheap ruled tablet paper found inside the envelope was written the following: "You put the police on me and I will get you and your husband too. 1339—39th Street, Logan Lewis." The sheet of paper found in the envelope was lined with dark blue lines and evidently taken from a · tablet ·of cheap writing paper. On Wednesday evening, the night of the fire, when Lewis left home to go to work, he wrote the telephone number of the janitor's room at the Hall of Records on a sheet of paper and gave it to his sister-in-law, with the injunction to call him at that number if

anything should happen. This sheet of paper on which the telephone number was written was similar to the sheet found in the envelope with the threatening message. There was subsequently found in the janitors' quarters at the Hall of Records a tablet of paper similar to the two sheets referred to and from which tablet the two sheets of paper in question had probably been taken.

About 3:30 o'clock on Monday afternoon the defendant met one Bell Hard, to whom he stated that he was on his way to purchase a new shirt and collar.

On Tuesday morning Lewis went to the place where he was accustomed to do janitor work each morning and asked Mrs. Grantham, a clerk in the office, if she had seen him at work there the previous morning and if so if she thought it was the usual time. He explained to her that his wife disappeared the day before and he wanted to make sure that she had seen him there that morning.

On the following Wednesday morning Lewis visited the place of business of Bell Hard and inquired if he had any coal-oil for sale. Hard replied that he did not, but that Lewis could secure some from the oil station across the street, which Lewis did and later advised Hard that he had secured the coal-oil.

On Wednesday evening before leaving for work at the Hall of Records defendant secured new batteries for a flashlight which he took with him when he left his home at about 10:30 o'clock. It was not his custom to carry a flashlight when he went to work. On this occasion he was late in reporting for work. On this same night, at about 11 o'clock, a man was seen entering the building later destroyed by fire. About twenty minutes later the building was first observed on fire. The key to the front door of this building was kept on the pulpit in the church property, where it could be secured by those who had occasion to use the building.

Thursday morning, after the body had been found, Lewis remarked to his sister-in-law, "I hope they won't put this on me." On the same day Lewis sent his nephew to the cleaners with a suit of clothes to be cleaned for him. Some days later defendant approached one Max Hunter, who was an employee of the cleaners, and requested him to find out, if he could, if Mrs. Randolph, who received the clothes to be cleaned, had noticed any blood stains on his clothes when they were brought in. After receiving no word from Hun-

ter after several days Lewis called him and found fault with him for not reporting to him as to what Mrs. Randolph may have observed with regard to the clothes.

About two weeks after the fire Lewis called on Hard, the man from whom he had sought to purchase coal-oil on the day of the fire, and said to him: "By the way, if anyone says anything to you about my buying coal oil, don't say anything, because they say the building was set on fire with coal oil."

Fire experts who were at the fire and who examined the floor of the building which had not been entirely consumed gave it as their opinion that at the point where the body was found there were indications that some inflammable liquid had been used in connection with the burning.

Several weeks after the fire a fair sized pipe wrench was found in the ashes at a point not far from where the body was found. Attached to the head of the wrench was some carbonized fabric, interwoven with fine wire such as is used in the manufacture of women's hats. This wrench was positively identified by Mr. and Mrs. Blanchard, relatives of Lewis, as one they formerly owned and which they had loaned to defendant but was never returned by him.

Reverend C. E. Caldwell, pastor of the church where the fire occurred, said he was very familiar with the tools that were about the premises and that he had never before seen the wrench in question in or about the building. He said that all of the tools belonging to the premises were accounted for after the fire.

Mrs. Lewis had taken out two life insurance policies, on one of which she was accustomed to pay the monthly premiums to a collector who called at the house. On the Saturday previous to the Monday his wife disappeared, Lewis went to the office of the insurance company and there paid the monthly premium. After her death he collected about $800 on one of the policies.

In order that the verdict of guilty in any criminal case may be upheld there must be proof in the record that will justify two general findings of fact; first, that the crime charged, the *corpus delicti*, has been established; and second, that the crime has been brought home to the one charged with the offense.

The evidence so clearly supports the jury's finding that Winnie Lewis was foully murdered that it would seem

unnecessary for the purposes of this opinion to further elaborate upon the evidence bearing upon this phase of the case.

As to the second proposition, the defendant's guilt of the crime, the evidence is not so conclusive. However, after a careful review and analysis of the evidence we have come to the conclusion that there is ample evidence to support the conclusion that the crime charged was committed by the defendant.

The rule that controls this review is stated by our Supreme Court in the case of *People* v. *Tom Woo,* 181 Cal. 315 [184 Pac. 389, 393], as follows: "It is the function of the jury in the first instance and of the trial court after verdict to determine what facts are established by the evidence, and before the verdict of the jury which has been approved by the court can be set aside on appeal upon the ground we are discussing, it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below." Added weight is given to the incriminating circumstances and the inferences justified by the evidence, in the fact that defendant was so thoroughly impeached on several vital matters.

The fact that the trial judge, who had the opportunity to observe the witnesses and particularly the defendant when on the stand, denied defendant's motion to set aside the jury's verdict and to grant him a new trial is a supporting factor to the verdict and one entitled to weight by this court in reviewing the evidence. (*People* v. *Ellis,* 188 Cal. 682 [206 Pac. 753].)

After a careful reading and examination of the entire record in the case and a thorough consideration of the points urged by appellant for a reversal of the judgment, we are satisfied that measured by the rule above quoted the judgment of the trial court should be sustained.

The judgment is affirmed.

Stephens, P. J., and Craig, J., concurred.

A petition by appellant to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 20, 1934.