[Crim. No. 210. Fourth Appellate District.—August 6, 1931.]

THE PEOPLE, Respondent, v. A. L. HODGES, Appellant.

Edward B. Patterson for Appellant.

U. S. Webb, Attorney-General, and John L. Flynn, Deputy Attorney-General, for Respondent.

BARNARD, P. J.—The defendant Hodges was, jointly with Anthony W. Patton, E. T. McCoy and G. M. Hunter, charged with the crime of murder in an indictment returned by the grand jury of Imperial County. The defendant Hunter was never apprehended, the defendant Patton was given a separate trial, and the defendants Hodges and McCoy were tried together. The jury found the defendant Hodges guilty of manslaughter and, under an advisory instruction by the court, found the defendant McCoy not guilty. Defendant Hodges has appealed from the judgment and from an order denying his motion for a new trial.

The general facts relating to the offense of which the appellant was convicted, may be briefly summarized as follows: For about a week prior to December 8, 1930, be-

tween 100 and 140 Filipinos had been living in the loft of an old barn in the city of Imperial. The presence of the Filipinos was resented by many persons in and around Imperial, to the extent that it had become a general topic of conversation on the streets and the resentment had become so pronounced that some of the talk amounted to veiled, if not open, threats against them. At about 8 o'clock on the evening of December 8, 1930, a bomb exploded in this barn, making a large hole in the dirt floor of the barn, particles of the bomb being driven through the floor of the loft and through the roof of the barn. Other particles passed through the side walls of the barn and into dwelling-houses on either side thereof. One piece of the bomb was found in a service station a half block away, having passed through the galvanized iron wall of the station. One piece of the bomb was blown through the body of Arriston Lampky, one of the Filipinos occupying the loft of the barn, resulting in his death a few hours later. Other particles of the bomb wounded three other Filipinos who were in the loft. The barn had a large door ten feet high by eighteen feet wide on the front end, and two windows on the sides. One of the Filipinos testified that about 8 o'clock, or a few minutes after that time, he heard something drop on the ground and that he saw an object there, approximately between twelve and eighteen inches long, which was smoking in the middle. Another Filipino testified that he heard something heavy drop, and that later, as he approached it, it exploded. Various witnesses fixed the time elapsing between the thud of the object falling on the ground and the explosion, at from three to six minutes.

Aside from the testimony of the co-defendant Patton, the record shows the following evidence tending to connect the appellant with the commission of the crime. The appellant had been prominent among those discussing the question of how to get rid of the Filipinos. He had solicited funds from various persons, to some of whom he did not tell what he proposed to do with the funds, while to others, he said it was "for the good of the valley". To at least one, he said it was for "explosives or dynamite—I understood him to say he wanted to scare some Filipinos out. Not that he was going to but that some other people were". A few days before the explosion appellant entered

the store of C. T. Gibson in Imperial, and asked for dynamite caps. Gibson said that he did not have any and suggested that he try the Imperial Valley Hardware Company, at El Centro. Another witness testified that several days before the explosion he heard the appellant say something about blowing up the Filipinos. Another witness testified that some time after 3 o'clock in the afternoon of December 8th, the appellant asked the witness if he would buy him a milk shake if he, the appellant, would knock the Filipinos out. One James Heath testified that about noon on December 8, 1930, he had a conversation with the appellant about some dynamite. He asked the appellant what he wanted the dynamite for and the appellant did not tell him. He told the appellant that he did not have any dynamite in his store in Imperial but that appellant could get it at the store in El Centro. A blacksmith named Ditto testified that about 10 o'clock on the morning of December 8, 1930, the appellant came to his shop alone, looking for a piece of pipe. The witness sent him to a junk pile outside of the shop and later the appellant returned with a piece of two and one-half inch pipe, sixteen inches long, with threads on one end. Appellant asked the witness if he could cut some threads on the other end of the pipe or if it would be cheaper to have the other end of the pipe welded closed. The witness told him the latter would be cheaper and that he could furnish a plug but that he would have to take it to another blacksmith to have it welded. The witness furnished a plug from a piece of shafting, the plug having had threads on it and also having a center hole made by reason of its having been set up in a lathe. A plug found at the scene of the explosion, and introduced into evidence, was identified by the witness as similar to the one he had furnished. The appellant left this blacksmith-shop with the pipe and plug, and some 20 or 30 minutes later returned with two other men, with the plug welded into the end of the pipe. At the request of the appellant, the witness drilled a hole about the middle of the pipe, returned it to appellant, and the men drove away. The witness asked the appellant what he wanted the pipe for, to which he replied that the witness would never know. Another blacksmith, George Merkle, testified that on December 8, 1930, a man came to his shop with a

piece of pipe and a plug; that at the request of this man he welded the plug into one end of the pipe; and that later three men came and took the pipe away with them. He identified the plug found at the scene of the explosion as in all respects similar to the plug he welded into the pipe that day. He first testified that he recognized three men in the courtroom as the three who had come to his shop, then that he was unable to tell which was which, and finally, on being asked if there was anyone in the courtroom whom he could identify as being one of the three, he replied: ''I haven't got no knowledge.'' One Traxler, employed by the Imperial Valley Hardware Company at El Centro, testified that during the afternoon of December 8th the appellant came into the store, showing a piece of pipe for which he wanted to buy a cap. The witness got a cap to fit the pipe and then sold the appellant four pounds of dynamite, and also some blasting caps. The witness testified that the pipe was between fourteen and twenty inches long, plugged at one end by a welded plug and threaded on the other, and that he fitted the cap to the threaded end of the pipe. He also testified that the plug in the closed end of the pipe was similar to the one found at the scene of the explosion. This witness was corroborated by another clerk in the same store. It was established by a number of witnesses that about 7:30 o'clock in the evening of December 8, 1930, appellant went to a house about a half-mile away from the barn in question, where a man known as ''Red'' Hunter was playing cards with some companions. Appellant said to Red, ''Are you ready?'' Red answered, ''No, I won't be for an hour or two.'' Appellant replied: ''That will be too late.'' A block and a half directly down an alley from the barn occupied by the Filipinos, were two pool-halls, one on each side of the alley with their back doors opposite each other. One Peters, testified that about 7 o'clock on this evening, at Salty's pool-room, he played two or three games of pool with appellant and that appellant then left the pool-room. Also, that appellant re-appeared at about 8 o'clock and had just started to play a game, having taken not more than two or three shots, when a man named John-son ran through the pool-room. Johnson testified that he was in Port's pool-hall, across the alley from Salty's pool-hall, when the explosion occurred; that he heard a kind of

thud and felt some vibration; that he told Mr. Port that he believed that there had been an explosion where the Filipinos were; and that he immediately ran out the rear door of that pool-hall and into the back door of the other pool-hall, running on through to the street. He testified that as he ran through Salty's pool-room he bumped into the appellant, who was playing pool at one of the tables, and that this occurred within a few seconds after he heard the explosion, just time for him to run 150 or 200 feet. A witness, Sproule, testified that on the morning of December 8, 1930, he met the co-defendant Patton on the street; that Patton asked him for some powder; that they both proceeded to the witness' home; and that he gave Patton some powder and also a quantity of fuse. When asked how much fuse, he replied, "It would run between two and one-half to three and one-half feet, somewhere along in there." He testified that he had had experience with this particular kind of fuse and when asked how long it would take that amount of fuse to burn, he replied, "Well now, I've never timed it up, but I would judge it would run around about a feet to a minute."

In addition to this evidence, Patton, a co-defendant, testified as follows: That he first met the appellant on the evening of December 6, 1930; that around 9 o'clock on the morning of December 8, 1930, he met the appellant in front of Salty's pool-hall; that they had some general conversation about what ought to be done with the Filipinos; that he and appellant then walked around several blocks, passing near the barn in question; that as they passed the barn appellant remarked that he had picked out the place where he would "throw it if nobody else did"; that the witness advised him not to throw it at that time; that when they returned to the pool-hall appellant asked an old man if he still had that fuse and powder, and the old man replied yes and walked away; that the appellant then told the witness he was going to get a piece of pipe and asked the witness to go down to where the old man was standing and tell him that he (Patton) wanted to get a piece of fuse and the powder, and for him to bring the same to appellant; that he did so and went with the old man to his home, secured the fuse and powder, returned to Salty's pool-hall and gave these articles to appellant; that Red Hunter then appeared

and appellant then began to solicit donations "for the good
of the valley"; that at the suggestion of appellant that
they go and get a pipe which he had at the blacksmith-
shop, the witness, Red Hunter and appellant, went to the
blacksmith-shop and appellant got the pipe; that the three
took the pipe over to another blacksmith-shop where they
had a hole drilled about the middle of the pipe; that at
Red's suggestion, they left the pipe at the blacksmith-shop;
that later, the witness and appellant drove in appellant's
car to the blacksmith-shop and the witness went in, brought
out the pipe and placed it in the car; that the witness and
appellant then drove to El Centro, where the witness re-
mained in the car and the appellant took the pipe and
went away; that when appellant returned to the car, he
had the pipe with a metal cap screwed on the threaded
end thereof, and also had with him a small brown package;
that upon their return to Imperial, they stopped at a long
red building where the appellant "took the pipe and what
I suppose was the dynamite in there and left it"; and that
the witness then went home. He further testified that he
returned to Salty's pool-hall that evening; that a few min-
utes later he asked the co-defendant McCoy to take him to
El Centro in his automobile; that as they went out of the
pool-hall, the appellant asked if they would take him down
to where the defendant Red was playing poker; that they
drove to a house on the east side of Imperial where appel-
lant went in while the others remained in the car; that
five or ten minutes later appellant returned to the car and
stated that Red was loser in the poker game and would not
leave; that appellant then said: "Take me home and I
will get it" and also, "I will fix the thing, I will fix the
bomb while you are gone"; that after they took appellant
to his home they proceeded to El Centro; that they re-
turned in a few minutes and again stopped at appellant's
house and went in; and that as they entered the appellant
remarked, "I have got it fixed." He then testified that
appellant "reaches into the door right straight ahead from
where I was standing, picks up this pipe and the fuse was
doubled up in his hand at that time". The witness then
testified that the three of them got into McCoy's car, taking
the pipe and fuse with them, and after driving past the
barn where the Filipinos were, parked their car near the

two pool-halls; that when he left the car, Hodges was still sitting in the car with the bomb in his lap; that the witness went into Salty's pool-hall and five or ten minutes later, McCoy came in the front door and about the same time Hodges came in at the back door; that they met near the center of the pool-hall, talked a minute, both went outside and later came in; that this is "the last I recollect"; and that the witness stayed in the pool-hall until Johnson came running through and said he thought the Filipinos had been blown up.

A few other facts are necessary for the consideration of one of the assignments of error made by the appellant. Shortly before the close of the case, the appellant, in the presence of his attorney, requested Rodney Clark, a deputy sheriff, to go to the appellant's house and get from a closet in the kitchen a piece of pipe and some dynamite. Clark testified that he did so and produced the pipe and dynamite in court. He testified that the appellant told him to "go over there and look in the closet in the kitchen and I would find the original pipe and dynamite". He testified that he found the articles on a shelf in this closet; that there was a little dust on the shelf and nothing else in the closet; and without objection, he testified that it appeared to him from what he was able to observe, that these articles had been recently placed there. He also testified that he knew of his own knowledge that the place had been searched the next morning after the explosion; that immediately after the explosion, the appellant had been taken to the same house and questioned by the witness and three others; and that the appellant had then said nothing about any dynamite or piece of pipe being in his house. An investigator from the district attorney's office testified that on December 9, 1930, he, with two others, searched every portion of the appellant's house and found no dynamite or pipe. It also appears that after the People rested, the attorney for the appellant asked for a recess until that afternoon, stating that one of his witnesses was not present. The court told him he had a number of witnesses and required him to proceed. Thereupon, he asked for a recess of ten minutes, which was granted by the court. After the recess, counsel stated that two additional witnesses had shown up and proceeded with his case.

Appellant first complains of a portion of the district attorney's argument to the jury, as follows: "Now, you remember how fussed Mr. Patterson was the other day when the prosecution quit, and the court said to Mr. Patterson, 'Go on with your case', and Patterson fumbled around and he hummed and hawed around and it took him half an hour to get started again. Why? Because they were up there planting the evidence at that very time, and he wasn't sure it was there, and he wanted to have a chance to get out of here and find out. It is the most disreputable thing I ever saw two attorneys pull in a courtroom. That is the reason he wanted to stall over 'till after dinner, to go over there and have this disreputable Hodges tell the sheriff they could find it, and after they got them there they found they had left some of it out. Yes. Are you going to believe that kind of stuff? Do you think there is anything to that? They put Rodney Clark on the witness stand one of the finest officers Imperial county ever had, one of the cleanest officers I have ever had anything to do with, one of the finest undoubtedly we ever had in this county and they went over and told Rodney Clark to go and get it. All right, why didn't they have some of Hodges' friends bring it in? I'll tell you why. It wouldn't look as good as to have Rodney Clark bring it in. When he said it looked as if it had been recently put there, did they cross-examine him on that? No, they dropped it. They knew they didn't dare to do it. He testified there wasn't any dust on it."

In this connection, another portion of the district attorney's argument to the jury is objected to, being as follows: "Now, there is another point of this evidence that I want to demonstrate to you. There it is, put that right on that cap. Look, that fits perfectly, absolutely the same circle, the same width, the same kind of threads, the same thickness, the same everything. That came out of that barn up there. And another thing, listen, they didn't produce this cap that they had picked up, that is what they forgot, they forgot this cap, and you have got to disbelieve Traxler and Fuller if you are going to believe this piece of concocted, damnable planted, perjury testimony."

It is first argued that the reference to planted or spurious evidence had nothing in the record to warrant it and that

all statements in connection therewith amount to testimony given by the district attorney. In the first place, when the first of the above statements, being the one mainly objected to, was made, no assignment of misconduct was made by the appellant. In *People* v. *Sieber*, 201 Cal. 341 [257 Pac. 64, 71], the court said: "The rule is that when a district attorney is guilty of misconduct in the trial of a criminal case, it is ordinarily the duty of counsel for the defense promptly to call the attention of the court thereto, and assign it as misconduct, or request the court to instruct the jury to disregard it. Such assignments and requests are necessary as a foundation for a complaint to this court."

We are unable to hold that there were no facts sufficient to justify an argument that the pipe found in the appellant's house by the deputy sheriff near the close of the trial, had not been there all of the time. The evident purpose of producing this pipe, with the testimony of where it was found in appellant's kitchen, was to meet the overwhelming evidence that had been produced showing the appellant had prepared such a pipe, and to show that the same had not been used by him. While a pipe was produced, no cap to fit the threaded end was produced, although three witnesses had testified that one had been procured by the appellant originally. While the district attorney is not to be commended for the manner in which this was discussed, the facts in evidence did warrant an argument along that line. These statements by the district attorney were not testimony but were his own argument or inferences that he drew from the evidence. Nor do we think the jury could have understood them otherwise. In *People* v. *Molina*, 126 Cal. 505 [59 Pac. 34, 35], the court quotes with approval from another case, as follows: "The right of discussing the merits of the cause, both as to the law and facts, is unabridged. The range of discussion is wide. He may be heard in argument upon every question of law. In his addresses to the jury it is his privilege to descant upon the facts proved or admitted in the pleadings; to arraign the conduct of parties; impugn; excuse, justify, or condemn motives, as far as they are developed in the evidence; assail the credibility of witnesses, when it is impeached by direct evidence; or by the inconsistency or incoherence of their testimony, their manner of

testifying, their appearance on the stand, or by circumstances. His illustrations may be as various as the resources of his genius; his argumentation as full and profound as his learning can make it; and he may, if he will, give play to his wit, or wings to his imagination.''

In reference to that portion of the district attorney's remarks to the jury above quoted, which reflects upon the attorneys for the defendant, it may again be observed that these remarks were not assigned as misconduct at the time they were made, or, in fact at any time. Shortly thereafter, when the remarks were made about the cap not being produced, counsel for appellant objected to that statement and assigned it as misconduct, and then said, ''I asked the court to instruct the jury to disregard all of the statements as to perjured testimony. That cap is over there, fit that cap there on these—'', whereupon the court instructed the jury: ''The jury will rely upon their own recollection of the evidence and not the assertions of either counsel.'' It would have been improper to instruct the jury to disregard all of the reference to the finding of the pipe in appellant's house, its completeness and the conditions under which it was found. While the remarks of the district attorney contained improper language, and some that should not have been used, any assignment of misconduct should have been definitely called to the attention of the court. Under the circumstances shown by this record, we do not feel that these remarks justify a reversal of the judgment. (*People* v. *Charlie,* 34 Cal. App. 411 [167 Pac. 703].)

In connection with the remarks of the district attorney to the jury, above quoted, appellant also insists that the commendatory statements about Rodney Clark, the deputy sheriff, constituted reversible error. Appellant relies upon *People* v. *Frank,* 71 Cal. App. 575 [236 Pac. 189]. In that case, it was held that certain commendatory remarks made by the trial judge and a deputy district attorney concerning certain witnesses, without whose testimony a conviction would have been impossible, was erroneous. In the case before us, if the remarks made be considered as going to the credibility of the witness, it was in favor of the appellant, as the witness had been put on the stand by him, and any inference that could be drawn in favor of the

credibility of the witness was therefore favorable to appellant. Moreover, the reference to the officer was more in the nature of a reference to his general standing than a comment upon his credibility, and was a part of the argument made in connection with the line of defense, in support of which this witness had been called. While it had much better been left unsaid, there was an element or argument in it, based, at least in part, upon facts before the jury, and in our opinion, no sufficient error or prejudice appears to warrant a reversal.

■ Appellant next complains of the following remark from the argument of the district attorney to the jury: "Well, as I said before Patton will be tried by some other jury, and you don't need to worry about that, you are trying these two men, and not Patton."

The record shows that when the co-defendant Patton was on the witness-stand an effort was made to get him to admit that he had been promised immunity if he would take the stand as a witness. He maintained throughout that he had been promised nothing by anyone. Appellant sets forth in his brief that, subsequently, the case against Patton was dismissed on motion of the district attorney. It is strenuously argued that appellant could not have been convicted without the testimony of Patton; that if the jury had known the case against Patton would be dismissed, they would not have believed his evidence; and that the district attorney misled the jury in the statement above quoted, thereby committing prejudicial misconduct. At this point we may refer to the fact that after the briefs were filed in this case, the appellant filed in this court a notice of motion for an order requiring the clerk of the trial court to transmit to this court a certain affidavit filed in that court by counsel for appellant, together with certain records of the trial court. This motion was taken under submission and is being considered in connection with the appeal in this case. By the records sought to be transmitted to this court, it appears that twelve days after the appellant's motion for a new trial was denied, a motion was made to dismiss the charges against the defendant Patton, which motion was by the court denied. Also, that five days later, in another department of the same court, a motion to dismiss the charge against defendant Patton was

granted. In connection with this motion to transmit evidence to this court, and also in connection with appellant's contention that the remarks of the district attorney above quoted constituted prejudicial misconduct, it is argued that at the time those remarks were made, the district attorney had no intention of trying the co-defendant Patton. No evidence of any such fact is presented, and nothing appears to justify such a contention other than the fact that the action was later dismissed as against Patton.

Not only did the dismissal of the action against Patton occur after judgment had been entered in this case, but these subsequent events are by no means so connected up with the remark made by the district attorney as to show prejudicial misconduct. Appellant's application to have this subsequent record transmitted to this court is denied. In addition it may be said that the evidence is not only sufficient to sustain the judgment against the appellant without reference to Patton's testimony, but his evidence stands uncontradicted and to a large extent corroborated by other evidence, and it would not appear from the record that, as claimed by the appellant, the jury would not have believed Patton even had they known that the case against him was not to be tried.

The next assignment of misconduct on the part of the district attorney is in connection with a remark made when counsel for appellant was attempting to identify the pipe which the deputy sheriff had brought from appellant's house shortly before the close of the trial. The court asked counsel if he had any further identification, to which counsel replied that he knew of none and the district attorney remarked "the defendant could identify it". The pipe in question was admitted in evidence. This statement of the district attorney is objected to as an indirect reference to the fact that the appellant did not take the witness-stand on his own behalf. At that time it did not appear whether or not the defendant would take the witness-stand. In any event, the making of the remark was not assigned as misconduct, and any error must be deemed to have been waived.

The next assignment of error relates to the following excerpt from the argument of the district attorney: "And another thing, you women on this jury, if your husbands were sitting over there where that defendant is sit-

ting, and eight pieces of dynamite had been in your cupboard where you kept your dishes and pans and cooking utensils, and there was a piece of pipe as big as that, you women sitting here on this jury now in all fairness, if your husband was sitting where that man is, wouldn't you get on the witness stand and testify that that pipe and dynamite had been there ever since that time? Why, of course you would.''

It is argued that this, in effect, was a comment on the fact that the appellant did not take the stand on his own behalf, and was also a comment that he did not call his wife to testify for him. In support of this contention, appellant cites the cases of *People* v. *Tufts,* 167 Cal. 266 [139 Pac. 78], and *People* v. *Terramorse,* 30 Cal. App. 267 [157 Pac. 1134]. Both of those cases refer to comment by the district attorney on the fact that the defendant objected to his wife's testifying. In this case, the defendant sought to prove that the pipe he was shown to have prepared was still at his home unused. He had himself begun this proof and it appears to us that the comment on the fact that he did not complete such proof in an obvious manner is considerably different from commenting on the fact that a defendant has exercised a right given him by law, as was the situation in the cases cited. But the remarks had no connection with or reference to the fact that the appellant did not take the stand. If it be conceded that the remarks were improper, it neither appears that they were sufficiently prejudicial to require a new trial, nor that the objection now made was presented to the court and assigned as misconduct. When asked what he claimed was misconduct, counsel for appellant said it was ''about the defendant not putting on any witnesses on his behalf''. When his attention was called by the court to the fact that no such statement had been made by the district attorney, but that he had referred to the failure to call appellant's wife, counsel for appellant made no correction and no further assignment of error. In a long, drawn-out trial of this nature, where many things are apt to occur in the stress of the moment, it is only reasonable that a defendant should be required to make plain his objections to the court at the time, when they may be corrected, in order to avoid the time and expense in repeating the entire proceeding. We think that

no reversible error is shown (*People* v. *Moore*, 111 Cal. App. 632 [295 Pac. 1039]). In this connection, it may be observed that the court instructed the jury that the neglect or refusal of the defendant to be a witness could not in any manner prejudice him, nor be used against him.

Prejudicial misconduct is claimed because in his argument to the jury the district attorney said: "Now I want to say this: do you know how many persons have been murdered in the United States since the first of January, 1930, by explosions of bombs? Have you any idea? Well, there have just been one hundred and eighty-two, that's what—."

In support thereof appellant cites *People* v. *Wong Loung*, 159 Cal. 520 [114 Pac. 829]. Not only does this statement fall within the class referred to in *People* v. *Molina*, *supra*, but the record shows that the statement was objected to and cited as misconduct, and the court instructed the jury to disregard it. In addition, the court gave a general instruction that all statements of counsel, if they were not supported by evidence, should be wholly disregarded by the jury.

The next point raised by appellant is that the court erred in permitting one Norbe to testify that he was in the barn on the night of the explosion, that he was wounded, and that his dog was killed. It was maintained that this constituted evidence of another crime. One of the issues in this case was whether Lampky came to his death because of this explosion, or by some other means. Testimony as to the effect and result of the explosion, and how pieces of the bomb were driven through the walls, flooring and into other persons, including the deceased, was pertinent to the issue. (*People* v. *Cooper*, 86 Cal. App. 441 [260 Pac. 886].)

The last point raised is that the court erred in refusing to allow peremptory challenges to the appellant because the co-defendant refused to join in said challenges. It appears that each co-defendant was allowed five peremptory challenges, and in addition they were allowed twenty peremptory challenges in which they might join. After appellant's five peremptory challenges were exhausted one juror remained to whom he desired to make a peremptory challenge, in which his co-defendant refused to join. The only argument made is that section 1098 of the Penal Code

is unconstitutional. However, the particular portions of the Constitution which it is claimed are violated by this section are not pointed out. The precise questions here raised were decided adversely to appellant in the case of *People v. Dowell*, 204 Cal. 109 [266 Pac. 807].

 The crime with which appellant is charged was a peculiarly atrocious one, endangering the lives of scores of innocent people in addition to the one who was killed. Most of the points raised by the appellant are addressed to misconduct on the part of the district attorney. The fact that the trial lasted eight days, with the bitterness shown by the record, may explain but does not excuse some of the matters complained of. The language used by the district attorney in some instances is certainly not to be commended, and some other things said had much better been left unsaid. In some cases a succession of errors might justify a reversal where the individual instances were not sufficiently prejudicial to require that action. However, in the instant case, where the evidence of appellant's guilt was so overwhelming and where it does not seem possible that the improper language used could have changed the result, we are of the opinion that, under all of the circumstances shown, such errors as appear are not sufficient to justify a reversal of the judgment.

For the reasons given the order and judgment appealed from are affirmed.

Marks, J., and Griffin, J., *pro tem.*, concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on August 20, 1931.