[Crim. No. 2572. Second Appellate District, Division Two.—September 18, 1934.]

THE PEOPLE, Respondent, v. DEMECIO GRANILLO, Appellant.

J. Harvey Hearn for Appellant.

U. S. Webb, Attorney-General, and Alberta Belford, Deputy Attorney-General, for Respondent.

WILLIS, J., *pro tem.* — Defendant was charged by information with the crime of murder, to which was added the charge of a previous conviction of the crime of assault with intent to commit murder. Upon arraignment he entered a plea of not guilty to the charge of murder and admitted the previous conviction. He was tried before a jury which returned a verdict of guilty of murder of the second degree. A motion for new trial was made and denied and judgment was entered. From the judgment and the order denying the motion for new trial defendant has brought this appeal.

The grounds upon which appellant relies for reversal of the judgment and order are as follows: 1. That the evidence is insufficient to support the verdict and judgment, in that the evidence shows that the wounds of which the deceased died were inflicted during a scuffle by a gun in the hands of deceased, and that there was no gun used by or in the possession of the defendant. 2. That the jury was unduly and prejudicially influenced by the closing argument of the district attorney in referring to the prior conviction and to the defendant as a "killer" by reason of such prior conviction. 3. That the trial court abused its dis-

cretion in denying defendant a new trial upon the ground of newly discovered evidence.

The evidence discloses that deceased, Antonio Loya, with his family, and defendant with his family were next door neighbors in West Los Angeles, and that some trouble had existed between them for some three months prior to the affray which resulted in the death of deceased. On February 14, 1933, deceased returned to his home from work, ate his dinner in the kitchen and went into the dining-room and proceeded to read a newspaper. His wife and children then proceeded to eat their dinner in the kitchen. Defendant came to the back door between 6 and 7 o'clock in the evening, knocked at the door and then came into the kitchen and asked for deceased, who came to the door from the dining-room and conducted defendant into the front or living room of the house. There is undisputed testimony that at the time defendant was drunk. In a few minutes deceased and defendant went out the front door, deceased apparently assisting defendant to walk, and they passed out to the front walk along the front of defendant's house and then to the rear thereof. Presently three shots were heard, and in a few moments deceased was seen to come to the front of the house with a gun in his hand. He proceeded to his own front lawn, where he fell and remained until an ambulance came and removed him. He had a bullet wound in the posterior surface of the calf of the left leg, ranging downward at an angle of about thirty degrees, and one in his chest about two and one-half inches below the right nipple and two inches to the left of the nipple line. The bullet causing that wound was later found in his body beneath the right twelfth rib. It had ranged downward at an angle of thirty to thirty-five degrees. From the effects of that wound he died on February 27, 1933. Defendant, after the affray, left his yard by the back way, got in his automobile and disappeared. He was found and apprehended in El Paso, Texas, in February of 1934, and brought back to Los Angeles.

As to what took place in the rear of defendant's house there is a conflict in the evidence, and it is upon the basis of the evidence creating this conflict that appellant assigns his claim of insufficiency of evidence.

Willie Loya, stepson of deceased, aged fourteen years, was called and testified as a witness for the People. He testified that he was in the kitchen with his mother and other small children when defendant entered and passed into the front room; that he heard no sound of quarrel but saw deceased and defendant go out the front door; that presently he heard three shots, which sounded as coming from the rear, and that he at once ran out the front door, along the walk and then to the rear of defendant's house on the side farthest from his home; that his mother went at the same time to the front, but did not follow him around the house; that when he reached the rear corner of defendant's house he saw deceased and defendant fighting; that defendant had a gun grasped in his right hand, with his finger through the trigger guard, and that deceased was trying to get the gun away from him; that deceased had hold of defendant's hand with the gun in it, while defendant struck deceased two blows with the other hand, on the face; that deceased finally got the gun away from defendant and started toward him but fell, and that defendant then ran away; that deceased arose and went to the front with the gun in his hand, while the witness, on his father's direction, ran to the police station for help and a doctor; that he was not with the witness Henry Varella, but met him on the way to the police station.

Mrs. Loya testified that Willie Loya was in the kitchen when defendant entered, and was eating his dinner when she heard the three shots, and that Willie ran out the front door; that she also went to the front and there saw Mrs. Granillo; that she saw deceased come around to the front of defendant's house with the gun in his hand; that she had never seen that gun before and that there was no gun in her house that night.

Defendant testified that on the evening in question he went to the home of deceased on his invitation, and then bought a pint of liquor from him, of which each drank some; that he then left the house, deceased going with him; that deceased insisted they go to the rear of defendant's house instead of entering by the front door, and that when they arrived at the rear deceased said, "Do you know that complaint that you put against me some time ago?" and then said, "Now I am going to show you a man"; that de-

ceased then struck him and threw him to the ground; that he arose and saw deceased with a pistol in his hand; that he grabbed deceased by the hands and a shot was let out, passing between them; that they continued to struggle for about fifteen minutes, and a second shot went downwards, and then a third shot, while they were still struggling. He further testified that he at no time had a gun in his possession; that after the three shots had been fired the two continued to struggle and he gave deceased a shove and then ran towards the alley, took his automobile and came to Los Angeles; that at no time did he see Willie Loya at the scene of the struggle.

Mrs. Granillo, wife of defendant, testified that she saw Willie Loya with her nephew, Henry Varella, across a way or alley on the same side of the street as her house, in front of a Filipino's house, at the time she heard a single shot; that she was just returning home from her sister's house.

Henry Varella, nephew of defendant, testified that he was just opening the front door of defendant's house, where he lived, when he heard one shot; that he immediately ran out to where his aunt, Mrs. Granillo, was; that he at that time saw Willie Loya seated on the steps of the Filipino's house, and that he told Willie to go with him to the police station; that Willie Loya did not go towards defendant's house; that his aunt told him to call the police officers.

Sam Mandivil, a witness called by the People, testified that he was approaching deceased's house when he heard and saw Mrs. Granillo screaming; that he had heard no shots; that at Mrs. Granillo's direction he started to go back of defendant's house and met deceased coming out to the front, holding his stomach, leaning over, with a small gun in his hand; that he had seen that gun in defendant's possession at defendant's house about two months before but had not closely examined it; that deceased handed him the gun, which he later delivered to the police officers; that he did not see defendant on that night; that some two months before this he had been called by deceased to come to his house, where he saw defendant just getting into an automobile with two or three other men, and heard Mrs. Granillo say to defendant: "Just because you got a gun you think they are afraid of you."

A police officer testified that the gun handed over to him was a .25 caliber Colt's automatic; that two empty shells fitting that gun were picked up by him at the scene of the affray and one empty shell was found jammed in the gun; that the clip still held two loaded cartridges.

The first point for consideration herein is whether the evidence is sufficient to justify the verdict. It is clear that there exists in the record a dispute as to the presence of the witness Willie Loya in the back yard of defendant's house and of his viewing the struggle he described; and, granting that he was present and viewed the struggle there, pyramided on that is the dispute between his version and that of appellant as to which of the contending parties had possession of the gun and caused the shots to be fired. Upon these disputes the jury found against the defendant and his evidence. The necessary implications from the verdict are that the jury believed that Willie Loya saw the affray as he described it and that the wounds inflicted on deceased were from a gun in the hands of defendant and fired by him with homicidal intent and malice aforethought. These findings are supported by direct evidence and inferences, and must be given full faith and credit. "The rule, upon appeal in a criminal case, is that the court must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence and then determine whether or not the guilt of the defendant is deducible therefrom. The question for the court to pass upon is whether there are facts before the jury to justify the inference of guilt." (*People* v. *Hennessey*, 201 Cal. 568 [258 Pac. 49].) This case cites *People* v. *Tom Woo*, 181 Cal. 315 [184 Pac. 389], wherein it is said: "For it is the function of the jury in the first instance, and the trial court after verdict, to determine what facts are established by the evidence, and before the verdict of the jury, which has been approved by the trial court, can be set aside on appeal upon the ground we are discussing it must be made clearly to appear that upon no hypothesis whatever is there sufficient substantial evidence to support the conclusion reached in the court below."

The facts which were before the jury in this case, as shown in the summarized statement thereof above, were ample to justify the verdict of guilty found by the jury.

The jury were constituted judges of the weight of the evidence and the credibility of the witnesses. By their verdict they presumably gave credence to Willie Loya and his version of the affray, and disbelieved that of defendant, and perforce believed that Willie Loya was present at the latter part of the affray and not at the Filipino's house. The adoption as true of the testimony of Willie Loya, in connection with the other evidence in the case relating to previous ill will, previous possession of the gun by defendant, his flight and the physical facts relating to the wounds and their position and direction, made it almost a necessity to find defendant guilty. The verdict is thus fully sustained by the evidence.

Appellant's next assignment of error is predicated on the remarks of the district attorney in argument in reference to the previous conviction of defendant. On cross-examination of defendant, who offered himself as a witness, he was asked by the district attorney if he had not been convicted of assault with intent to commit murder, a felony, to which defendant answered, "Yes," and that he had pleaded guilty to that charge. There was no objection offered to this inquiry by defendant, and of course such cross-examination was permissible for purposes of impeachment of defendant as a witness. (Secs. 2052 and 2065, Code Civ. Proc.) By presenting himself as a witness he waived the privilege accorded a defendant by section 1093 of the Penal Code, of keeping from the jury the knowledge of the presence of an admitted charge of previous conviction in the information, and also the privilege accorded by section 1025 of the same code, which forbids allusion to such admitted charge of previous conviction at the trial. (*People* v. *Arnold*, 116 Cal. 682 [48 Pac. 803]; *People* v. *Rogers*, 94 Cal. App. 470 [271 Pac. 351].)

The waiver of these privileges operates only to the extent of permitting the use of such evidence of previous conviction to impeach defendant as a witness—to lessen his credibility as such but not to expose or prove his character or disposition in respect to commission of crimes, either past, present or future. When the defendant in this case surrendered these privileges by presenting himself as a witness, he nevertheless still stood under the protection of the general rule that evidence of previous independent crimes or

convictions thereof cannot be used at the trial for the purpose of proving the commission of the crime charged therein or to show a predisposition on the part of the defendant to commit the offense with which he is charged. (*People* v. *Pozzi*, 91 Cal. App. 150 [266 Pac. 860]; 8 Cal. Jur. 58.)

To understand and weigh the significance and effect of the remarks of the district attorney hereinafter quoted, and which were at the time assigned as misconduct, it is necessary to advert first to a portion of the testimony of the witness Sam Mandivil. On direct examination by the district attorney he had testified that some two months before the affray in question he had seen the gun which deceased had handed to him, in the possession of defendant. This he repeated on cross-examination when he was confronted with the transcript of the testimony he gave at the coroner's inquest, wherein in answer to the question, "Did you ever see Granillo have a gun?" he said, "I have not, no sir." He admitted he did give such answer to that question and that he had changed his testimony. Then the following questions were asked by the court and the following answers given: "Q. Why did you change it? A. Because I wanted to. Q. Well, why did you want to? A. Well, if you want to do something go ahead and do it. Q. Well, which is true? A. Well, what I am talking about now. Q. In other words, it is true that you did see a gun in his hands two months before? A. It is true that I did. Q. Well, why did you tell the coroner that you did not? A. Well, Granillo wasn't present at the time. Q. You mean that Granillo was not at the inquest? A. He was not." Just preceding this the witness had said: "If you wish me to explain it, I will"; to which the court said, "All right, make your explanation now." The witness then said: "You are trying to give the jury the impression that the gun belonged to Loya—," and, "I didn't have any intention of bringing this up, and I am telling you the truth, just what it was."

In his closing address to the jury the district attorney said: "Sam Mandivil has come in for considerable comment. There is no deep mystery about anything that happened in this case, but Mr. Hearn would have you think there are a lot of mysterious angles to this case. It is all very simple. I will tell you this, that the fellow that was scared to death

was Sam Mandivil; that is the reason he testified the way he did at the coroner's inquest. Why? Because he knew that this man had been up before for assault with intent to commit murder. That is true, and what does it mean? It means that somewhere, some time ago, this man assaulted somebody and intended to kill him. And hence Sam Mandivil knew that this man was a killer, and Sam did not want to get scalped. That is all there is to that and nothing else. Then between the coroner's inquest and this trial Sam gets up a little courage and tells us the truth." After a few remarks on another subject the district attorney addressed the jury as follows: "Well, just to show you that there isn't any reason for a doubt and to get you closer to the facts so that you can see them a whole lot more clearly, would you mind if I transported you folks out there to the scene of this crime at the very time it happened? Let me put you in the shoes, say of Willie Loya, and let us assume that Willie knew that this man had before been convicted—not found guilty but he pleaded guilty. He got up in court and said, 'I assaulted a man and intended to kill him.' That is what he said on this previous occasion. Let us assume that Willie knew that and you are placed in Willie's shoes. . . . Now let me tell you in closing just the type of chap that is asking you to give him a break. That is what he is asking for in the parlance of some of us less intellectual fellows in court. He has passed judgment on two human beings. He did it two years ago. He said at that time, 'I intended to kill you,' but he missed." At this point counsel for defendant interrupted, saying: "Now just a moment, if your Honor please; I assign that as misconduct and ask that it be stricken." To which the court responded: "I think you have gone beyond the proper limit in arguing the question on the prior conviction. The evidence of a prior conviction may be considered for the sole and single purpose of weighing the credibility of the defendant as a witness, and you are instructed, ladies and gentlemen, to disregard any argument of the district attorney based upon the alleged prior conviction other than for that one single purpose." Counsel for defendant then stated: "Thank you, your Honor. I would like to have those remarks assigned as error because he should not have discussed it." Thereupon the district attorney said: "And

I will also join with counsel in his request. And he also passed judgment out at 1630 Cotner Street on Mr. Loya as to whether he should live or die. That is the type of man that you have before you.''

That the repeated reference to the previous conviction of defendant as quoted above constituted misconduct is patent. There was no evidence before the jury that either Mandivil or Willie Loya knew of such previous conviction; yet the district attorney asserted that it was knowledge of that fact that caused Mandivil to testify falsely at the coroner's inquest, and the reference to it in connection with Willie Loya was entirely irrelevant. It is clear that the repeated reference was for the purpose of calling to the jury's attention the type of man who was on trial, and to impress on them the conclusion that he was a ''killer'' type. Did this misconduct result in prejudicially affecting the jury's consideration of the case and to so control the verdict as to amount to a miscarriage of justice, despite the court's instruction to disregard the remarks?

Each case of misconduct must be judged by its own particular circumstances, and before a judgment is reversed on that ground it must appear that the misconduct reached the point where injustice resulted to the defendant. And it is a general rule that misconduct of the district attorney will not suffice to justify the granting of a new trial if upon the whole case it can be said that the possible effect thereof was subsequently removed by a proper admonition of the trial court to the jury, having in mind the presumption that the jury obeyed the court's instruction. It has wisely been said that for the protection of the innocent who may be accused of crime the law very properly has prescribed certain rules of practice in the trial of the accused which are to be observed as well in the case of the guilty as of the innocent. In carrying out these humane and wise provisions of the law it becomes the duty of the court, however, not to allow the ends of justice to be defeated by any refined technicalities. In connection with the charge of misconduct, therefore, something must be allowed to the zeal of the counsel on either side in discussing the case before the jury, and before judgment is reversed on that ground it must appear that such misconduct transcended the bounds of propriety and prejudiced the defendant in

the minds of the jurors. (*People* v. *Warner,* 147 Cal. 546 [82 Pac. 196].)

Herein, in his zeal of closing argument, the district attorney only emphasized, improperly we believe, what the jury already had before it, viz., the fact that defendant had previously pleaded guilty to a charge of assault with intent to kill. It is true that that fact was admitted in evidence only for the purpose of impeaching defendant's credibility as a witness, and not to prove that he was of the "killer" type. Such is the refinement of the law in respect to admission of such evidence that notwithstanding an admitted previous conviction pleaded in an information may not be alluded to at the trial, nevertheless it may be admitted in evidence and used in argument to impeach credibility of the defendant once he offers himself as a witness. It is a matter of common experience and knowledge that once the average juror learns that the defendant has previously been convicted of a crime of the same class as that for which he is being tried, that juror will consciously or unconsciously consider and allocate to a type or class the man on trial, as distinguished from the ad-measuring of his credibility as the witness on the stand; and this despite all instructions by the court, for the court may not, except by virtue of presumption, control the ordinary process of the human mind and its natural gravitation toward the ordinary and usual inferences or implications which flow from knowledge of an established fact. So herein, when the evidence of the previous conviction was once lawfully before the jury, the members thereof were, in natural course, in position to draw the same conclusions as were reflected by the district attorney's statements. What he said was an improper reminder to them that defendant had once before tried to kill a man, but they already knew that through the legal channel of evidence. Upon objection being made—and herein it was somewhat belated—the court promptly and properly admonished and instructed the jury. In the light of these circumstances it cannot be said that the remarks assigned as misconduct operated to the prejudice of the defendant or in any degree affected the jury in arriving at its verdict.

There was no abuse of discretion by the trial court in denying the motion for a new trial. The motion was

urged on the ground of newly discovered evidence, and was supported by two affidavits to the effect that the witness Willie Loya was in the presence and view of each affiant from the time of the shooting until he ran to the police station, hence he could not have been in the rear of the house as he testified and could not have viewed the struggle as to which he gave testimony. It is clear that the testimony of these two affiants, if admitted, would have been contradictory of that of Mrs. Loya and Willie Loya, and cumulative as to that of Mrs. Granillo and Henry Varella. Evidence which is designed to contradict a witness or is merely cumulative is not justification of a new trial. (*People* v. *Anthony*, 56 Cal. 397; *People* v. *Weber*, 149 Cal. 325 [86 Pac. 671]; *People* v. *Loveless*, *ante*, p. 291 [35 Pac. (2d) 574].) And it has been held that newly discovered evidence which, if admitted, would be corroborative merely of the testimony of the defendant, tending to impeach the prosecuting witness, was not of itself sufficient ground for granting a new trial. (*People* v. *Vejar*, 93 Cal. App. 259 [296 Pac. 671].) ▓ The claim of newly discovered evidence as ground for new trial has always been regarded by the courts with a great deal of suspicion and disfavor (*People* v. *Freeman*, 92 Cal. 366 [28 Pac. 261]); and the question as to the effect upon the case of newly discovered evidence is from its nature peculiarly one that is addressed to the discretion of the trial court (*People* v. *Oxnam*, 170 Cal. 215 [149 Pac. 165]). ''The claim of newly discovered evidence is viewed with distrust and disfavor, and in the absence of the strictest showing of diligence, or upon the tender of merely cumulative evidence, or evidence which would not strongly tend to produce a different result, a new trial will be denied.'' (*People* v. *Staigers*, 92 Cal. App. 628 [268 Pac. 923].) The motion and questions arising thereunder were for the consideration of the trial court in the first instance and were addressed to its sound legal discretion, and unless it is plainly shown that this discretion has been abused—that the showing made was of such a character as to make it manifest that the case would or should result differently on a new trial in view of the newly discovered evidence—the order of the trial court refusing a new trial will not be disturbed. No such

showing appears herein. Furthermore, there is in the record no sufficient showing of diligence on the part of defendant to secure these witnesses for the trial. He was not taken by surprise by the testimony of Willie Loya, whose previous testimony at the preliminary examination he had heard, and the witnesses were neighbors and easily discoverable upon use of diligence. This absence of showing of diligence would in itself justify the order refusing a new trial.

Judgment and order affirmed.

Stephens, P. J., and Desmond, J., concurred.