[Crim. No. 2180. First Dist., Div. Two. Jan. 2, 1942.]

THE PEOPLE, Respondent, v. ROBERT MANDELL, Appellant.

Hugh S. Center, Marshall S. Hall and John E. Longinotti for Appellant.

Earl Warren, Attorney General, David K. Lener, Deputy Attorney General, John P. Fitzgerald, District Attorney, and A. Andreuccetti and J. B. Peckham, Assistants District Attorney, for Respondent.

SPENCE, J.—Defendant was charged with the murder of Josephine Parsen, a girl sixteen years of age. He entered the pleas of not guilty and not guilty by reason of insanity. On the plea of not guilty, the jury found the defendant guilty of murder in the first degree and further found that defendant was under the age of eighteen years at the time of the commission of the offense. (Penal Code, sec. 190.) On the plea of not guilty by reason of insanity, the jury found that defendant was sane at the time of the commission of the offense. Defendant's motion for a new trial was denied and he was sentenced to the state prison. He appeals from the judgment of conviction and from the order denying his motion for a new trial.

The main contention of defendant on this appeal is that the evidence was insufficient to sustain the conviction and it therefore becomes necessary to summarize some of the unpleasant details revealed by the evidence. It may be stated preliminarily that defendant was convicted upon circumstantial evidence and that he did not take the witness stand in his own defense.

The deceased and defendant lived a few blocks apart in the city of San Jose. They were students and they had known each other for some time. They were approximately the same age but defendant had not as yet reached his sixteenth birthday. Defendant lived on First Street and the deceased lived on Hobson Street which intersects First Street at right angles. On the night of July 1, 1940, deceased had been swimming at one of the schools in San Jose and she was returning home by walking along First Street and then along Hobson Street. As she passed the home of defendant, he spoke to her and accompanied her on her journey. She was seen by two schoolmates

walking with defendant shortly before 10 p. m. in a westerly direction on Hobson Street toward her house and approaching the Hobson Street Bridge. This bridge spans the bed of Guadalupe Creek. Deceased was last seen passing over the crest of the bridge in the company of defendant. Shortly thereafter, said two schoolmates heard a scream from the direction of the bridge and one of them expressed the hope that it "was not Josephine." These schoolmates went up near the bridge but saw nothing and returned.

Early the following morning, the dead body of the deceased was found near a pathway in the bushy section of the bed of Guadalupe Creek about fifty feet or more north of the Hobson Street Bridge. This pathway runs down from the westerly side of the bridge. The condition of the body clearly demonstrated that the deceased had been the victim of an attempted rape and murder.

Along the pathway between the westerly side of the bridge and the place where the body was found, were strewn various articles of wearing apparel and personal effects of the deceased including a hair ribbon, a handkerchief, a shoe, a book, and a towel wrapped around a bathing suit and cap. The body of the deceased was found lying full length upon her back with her feet slightly apart. Her dress was pulled up and her shorts were pulled down, exposing the mid portion of her body. One shoe was missing from her foot. There was blood and dirt in her hair and ants were present in large numbers about her body. A piece of brick, which was triangular in shape and which appeared to be freshly broken, was found near her head. At some time during her struggle the deceased had had an evacuation and fecal matter was found upon her dress, slip and shorts as well as upon her buttocks and thighs. The nature of the loose soil in the vicinity made it impossible to obtain any definite footprints but this loose soil was dented and cut up.

An autopsy was performed which showed among other things a gaping wound in the right temple region and a maceration of the right side of the head and scalp. There were other injuries to the body including contusion and abrasion about the private parts and a severe contusion about the neck as if caused by gripping or choking. The immediate cause of the death was brain injury.

In the late afternoon of July 2, 1940, defendant was taken into custody near his home. He was wearing a khaki shirt

and dark jeans. Portions of the shirt were covered with small blood spots. When asked by the police how these blood spots got upon his shirt, he replied that he did not know. He was interrogated at length by the police and admitted that he knew the deceased; that he went to school with her; that he had seen her at about 9:30 p. m. on the night before; and that he had walked down First Street with her for a short distance when she passed his home at that time. He repeatedly denied, however, that he had walked along Hobson Street with her or that he had been on Hobson Street at any time on that night. He was confronted with the two schoolmates of the deceased who had previously known both the defendant and the deceased. They stated in his presence that they had seen him on the previous night walking with deceased by the home of one of the two girls on Hobson Street and toward the Hobson Street Bridge. They also told of hearing the scream and of their going to the bridge but seeing nothing. Defendant replied, ''The girls are mistaken, I wasn't there.'' These girls also stated that at the time mentioned, defendant had worn the same khaki shirt but different trousers; that he had worn light corduroy trousers on the night before. Defendant admitted that he had worn the khaki shirt and light corduroy trousers on the previous night and stated that the corduroy trousers were at his home to be washed. These trousers were immediately obtained from his home and it was found that there were brown colored spots along the thighs and knees which were later found to be fecal matter which gave the same refractive index as that found upon the body and clothing of the deceased.

Upon the trial, the two schoolmates of deceased testified as above indicated and further testified that they had seen defendant on Hobson Street on two previous occasions on the same night. Police officers testified to the other facts relating to the conditions at the scene of the crime and also to the conversations with defendant following his apprehension. Expert testimony was also introduced including testimony concerning the blood spots and the brown spots of fecal matter found on the clothing of the defendant. It also appeared that two handkerchiefs were found in the pocket of defendant's trousers and that one of these contained brownish spots which proved to be fecal matter. It further appeared that the woolen jacket of the deceased was covered with numerous foxtails and that foxtails were found in the cuffs

of the defendant's corduroy pants and also on the right leg and at the waist band. Black wool fibers, mixed with sand, were also found in the cuffs of defendant's trousers and said wool fibers compared with the black fibers taken from the woolen jacket of the deceased.

There was also introduced in evidence two conversations in which defendant participated during the earlier part of the year 1940. Another school girl, who knew both the deceased and defendant, testified that she was walking home from school one evening with the deceased; that they met defendant and that he asked to walk home with them; that deceased said "—— no, that she didn't want to walk home with him and she made some remark about disliking him ——"; that defendant left them but before leaving he said that "—— some day she'd get the works or some day he'd give her the works." The second conversation was one between defendant and another student at a school dance. This student had danced with deceased and after dancing with her, he went over to defendant and talked to defendant concerning deceased. In the conversation, defendant said, "—— he'd like to give her the works." On cross-examination the witness was asked whether defendant meant by said remark "something of a sexual nature" and he replied, "That's the way I understand it."

We believe that the foregoing constitutes a sufficient summary of the evidence for the purposes of this discussion. It is obvious that said evidence showed that the deceased had been murdered and it is entirely clear that the evidence pointed directly at the defendant as the perpetrator of the crime. In the face of this evidence, defendant failed to take the stand to deny or explain, if he could, any of the numerous circumstances which clearly indicated his guilt.

In contending that the evidence was insufficient to sustain the conviction, defendant presents an argument which would be a more appropriate argument to address to the triers of the facts rather than to an appellate tribunal. He takes each of the several circumstances which tended to connect the defendant with the crime, and argues either that the testimony with respect to each such circumstance was not true or that if true, such circumstance alone had little, if any, tendency to implicate the defendant. Defendant argues that the two schoolmates of the deceased were mistaken and that their testimony was but the figment of the imagination of

two adolescent girls; that even if true, such evidence would not "satisfactorily connect him" with the murder; that the testimony of "alleged threats" did not show any threats at all and, in any event, the incidents were too remote; that the expert testimony was unsatisfactory and inconclusive; that the experts, owing to the condition of the blood spots, could not positively identify said spots as spots of human blood rather than of animal blood; that the experts would not positively state that the fecal matter on the girl's clothing and on the defendant's clothing came from the same person but only that it gave the same refractive index; that the blood spots on defendant's clothing were small spots while the injury to the deceased's head would indicate that anyone perpetrating the crime would have had larger blood spots upon his clothing; that the fecal matter found on defendant's trousers was found in small quantities in numerous spots and not in large quantities; that foxtails are found everywhere in the vicinity and that their presence on the defendant's clothing should therefore be totally ignored; that with respect to the wool fibers on defendant's clothing, the experts admitted. that all common wool fibers look about the same; and also that the evidence tended to indicate that the crime was a "left-handed" crime while defendant was right-handed. It seems entirely clear that these arguments relate either to the credibility of the witnesses or to the weight to be attached to each of the numerous circumstances to which reference has been made. These questions were the questions which were submitted to the jury for its determination. The jury was entitled to accept the testimony of the witnesses as true and to draw all reasonable inferences therefrom. In our opinion, there was ample evidence to sustain the conviction of the defendant. (*People* v. *Newland,* 15 Cal. (2d) 678 [104 Pac. (2d) 778]; *People* v. *Perkins,* 8 Cal. (2d) 502 [66 Pac. (2d) 631]; *People* v. *Tom Woo,* 181 Cal. 315 [184 Pac. 389].) We find nothing inherently improbable about said testimony as claimed by defendant.

Before leaving the foregoing discussion concerning the alleged insufficiency of the evidence, a word might well be added concerning defendant's argument that it was "physically impossible for a right-handed person to have murdered the girl." This argument is based upon the theory that several blows were struck with great accuracy on the right side of the deceased's head and that said blows were struck while

the deceased was standing, facing her assailant, and was being held by the throat by the right hand of her assailant. It is argued that a right-handed person could not have struck the several blows with such accuracy on the right side of the deceased's head during the struggle. This argument is highly speculative as it presupposes that the deceased was standing while all the blows were struck. It appears more probable that deceased was on the ground and perhaps unconscious at the time that the blows, which resulted in the head injuries which caused her death, were struck.

Defendant next complains that there was prejudicial misconduct on the part of the district attorney. It is frankly stated at the outset, however, that "we will agree that certain incidents, remarks and references complained of hereinafter would not of themselves if standing alone constitute prejudicial misconduct." Defendant then proceeds to set forth numerous instances of alleged misconduct. With respect to some, no assignment of misconduct was made and with respect to others, the trial court promptly admonished the jury to disregard the remarks to which objection had been made. It would serve no useful purpose to set forth and discuss the numerous portions of the record to which reference is made. We have examined the record with particular reference to these instances and we are of the view that there is nothing to be found in the conduct of the district attorney which would warrant a reversal. The trial was a lengthy one and it may be conceded that some of the remarks made might well have been left unsaid. But if these remarks, taken separately or collectively, may be said to constitute misconduct, we believe the situation presented by this record shows that the alleged misconduct was trivial in character and that it may not be held to have been prejudicial to defendant under the circumstances. (*People* v. *French*, 12 Cal. (2d) 720 [87 Pac. (2d) 1014] ; *People* v. *Hanks*, 35 Cal. App. (2d) 290 [95 Pac. (2d) 478] ; *People* v. *Cabaltero*, 31 Cal. App. (2d) 52 [87 Pac. (2d) 364] ; *People* v. *Hodges*, 116 Cal. App. 61 [2 Pac. (2d) 174] ; 8 Cal. Jur. 621, sec. 602.)

Defendant also complains of alleged prejudicial misconduct of the trial judge. But two instances are cited. The first occurred during the cross-examination of the chief of police. Counsel for defendant asked the witness to describe the "technique" used by the police department in questioning the defendant. Counsel stated to the witness, "I am

going to ask you a very frank question and I hope you'll be just as frank." The court said, "One moment, it isn't necessary to reprimand the witness as to his answers. . . . We don't need any reprimanding of witnesses in this court." No assignment of misconduct was made and no request for any admonition to the jury was asked until a later session of the court. The trial court then declined to give such admonition. We find no misconduct in the above incident. The trial court's remark was prompted by the remark of defense counsel. Said remark of counsel carried the insinuations that in his opinion the witness had not been frank in his previous testimony; that he probably would not be frank in his answer to the question propounded; and that there had been unfair methods used in questioning the defendant. While these matters might have been the proper subjects for argument to the jury, the witness was entitled to protection from such insinuations in the questions of counsel asked during the cross-examination.

The second incident occurred after the trial on the first plea and before the trial on the second plea. The juror Minton stated that he felt disqualified to act as a juror on the second plea as he had visited insane wards and could not vote to send the defendant to an insane ward. The trial court suggested the use of an alternate juror, the district attorney expressed his willingness to stipulate to the use of an alternate juror but counsel for defendant refused to so stipulate. In the discussion which followed, the trial court said, "Well, if you don't want Mr. Minton, why didn't you stipulate that he be dismissed?" Counsel for defendant said he felt that the remarks of the juror Minton had affected the whole jury despite the fact that the trial court had admonished the jury to disregard them. The trial court said, "There is nothing in that at all." Here again we find no misconduct on the part of the trial judge. Our review of the record shows that the trial judge conducted the trial in a fair and impartial manner and that there was nothing in his conduct which prejudiced the defendant.

Defendant further contends that the trial court committed prejudicial error in admitting certain evidence. Defendant concedes that he did not offer an objection to every portion of the claimed inadmissible testimony. But assuming that he did, we find no prejudicial error in the admission of

the testimony to which reference is made in defendant's brief. The first testimony to which defendant directs our attention is that of the police officers, which testimony related to their conversations with defendant on the day of his apprehension. The sole objection made is that these conversations constituted hearsay. While defendant did deny his guilt, it is entirely clear that these conversations embraced many admissions by the defendant including the admission that he had been in the company of the deceased at a late hour on July 1, 1940, and at a point not far from the place where her dead body was found on the morning of July 2, 1940, and that on the night of July 1, 1940, he had worn the shirt which was covered with blood spots and had worn the trousers which were covered with spots of fecal matter It requires no citation of authority to demonstrate the admissibility of such evidence. Defendant also directs our attention to the evidence showing that in two conversations earlier in 1940, defendant had made statements to the effect that he would like to or was going to give the deceased "the works." As above stated, the meaning of these expressions was shown on cross-examination of one of the witnesses by defendant's counsel. Such statements of defendant, if not in the nature of threats, were clearly admissible as tending to show the intent or state of mind of the defendant toward the deceased and the claimed remoteness in point of time was a matter which affected the weight rather than the admissibility of such statements. Lastly, defendant directs our attention to the evidence of one of the schoolmates who testified to saying to the other schoolmate upon hearing the scream, "I hope that isn't Josephine." The trial court, in overruling the objection to this testimony, stated that the testimony was limited entirely to the reaction produced and that it would be "worthless for anything else." Assuming, without deciding, that the admission of such testimony constituted error, such error cannot be held to have been prejudicial under the circumstances presented by the record before us.

 Defendant contends that the trial court committed prejudicial error in refusing to give certain instructions requested by defendant. The first of these requested instructions was to the effect that the prosecution was required to prove the guilt of the defendant beyond a reasonable doubt and that the death of the deceased "could not have been caused by an accident or by any person other than the defen-

dant." The first part of the requested instruction was expressly and completely covered by the instructions given. ■ The refusal to give the portion above set forth in quotation marks cannot be held to be prejudicial error under the circumstances revealed by the record before us. It is a sufficient answer to defendant's contention to point out that defendant's alleged "theory" that some person other than defendant committed the murder found no support whatever in the evidence. It was therefore sufficient to instruct the jury that the prosecution was required to prove the guilt of the defendant beyond a reasonable doubt and it was not necessary to instruct the jury upon any assumed issue which found no support in the evidence. (*People* v. *Roe,* 189 Cal. 548 [209 Pac. 560]; 8 Cal. Jur. 321, sec. 371.) ■ The second of the requested instructions was one embracing an instruction respecting manslaughter as well as murder. The trial court instructed the jury solely upon murder and refused to instruct the jury upon manslaughter. We find no error in this refusal. The defendant was charged with murder and there was abundant evidence to prove his guilt. There was no evidence whatever to indicate that the crime was that of manslaughter rather than that of murder. Under these circumstances, an instruction with respect to manslaughter was not required. (*People* v. *Mitchell,* 14 Cal. (2d) 237 [93 Pac. (2d) 121]; *People* v. *Shannon,* 203 Cal. 139 [263 Pac. 522]; *People* v. *Hickok,* 28 Cal. App. (2d) 574 [83 Pac. (2d) 39]; 13 Cal. Jur. 607 and 608, sec. 20.)

■ Finally, defendant contends that the trial court abused its discretion in denying his motion for a new trial. He argues that the jury was guilty of misconduct by which a fair and impartial trial was denied him. He refers to the conduct of the jurors Minton and Bronner. The alleged misconduct of the juror Minton was previously discussed with relation to the alleged misconduct of the trial judge. After juror Minton had stated that he felt disqualified to act on the second plea, he was interrogated at length and it appeared that he was entirely willing to abide by the instructions of the court in determining the issue on the second plea. The juror Bronner merely said he "would like to be excused also." We find no misconduct on the part of the jury or any member of the jury. In any event, defendant was offered the opportunity to stipulate to the use of an alternate juror but

he refused to so stipulate. Defendant also argues that a new trial should have been granted upon the ground of newly discovered evidence. The alleged newly discovered evidence was that of a witness who claimed to have seen the deceased in the company of an unidentified man, other than the defendant, between 10 p. m. and 10:15 p. m. on the night of July 1. The contents of the affidavit of the alleged newly discovered witness was seriously impeached by affidavits filed in opposition to the motion and, in view of the case made against the defendant upon the trial, the trial court was probably not impressed with the showing made or with the likelihood that the production of such evidence would bring about any different result upon a second trial.

 A motion for a new trial based upon the claim of newly discovered evidence is universally looked upon with distrust and disfavor (8 Cal. Jur., pages 427, 428, sec. 452; *People* v. *Yeager*, 194 Cal. 452 [229 Pac. 40] ; *People* v. *Granillo*, 140 Cal. App. 707 [36 Pac. (2d) 206]) and much must be left to the discretion of the trial court in granting or denying a motion for a new trial on that ground or any other ground. Where the trial court refuses to grant a new trial, an appellate court should not interfere except upon a clear showing of an abuse of discretion by the trial court. (*People* v. *Norton*, 45 Cal. App. (2d) 789 [115 Pac. (2d) 44] ; *People* v. *Egbert*, 43 Cal. App. (2d) 117 [110 Pac. (2d) 495] ; *People* v. *Addington*, 43 Cal. App. (2d) 591 [111 Pac. (2d) 356].) We find no such clear showing of an abuse of discretion in the present case.

The judgment of conviction and the order denying a new trial are affirmed.

Nourse, P. J., and Sturtevant, J., concurred.