[Crim. No. 3111.  Second Appellate District, Division One.—July 28, 1938.]

THE PEOPLE, Respondent, v. LEO EKSTRAND, Jr., Appellant.

(1) .

Fred G. Sutherland and William W. Larsen for Appellant.

U. S. Webb, Attorney-General, and Alberta Belford, Deputy Attorney-General, for Respondent.

WHITE, J.—In an information filed by the district attorney, defendant was accused in counts I and II of the crimes of attempted robbery, while in count III he was charged with the offense of robbery. Count I was dismissed on motion of the district attorney, and after the entry of not guilty pleas to counts II and III, a trial was had thereon before a jury, resulting in the conviction of appellant on both counts and a finding by the jury that at the time of the commission of each offense the defendant was armed with a deadly weapon. From the judgments pronounced, and from the order denying defendant's motion for a new trial, this appeal is taken.

Appellant's first contention is grounded upon the claim that the evidence is insufficient to support the verdicts, in that it falls short of the degree of proof necessary to identify appellant as the perpetrator of the crimes. We have given considerable time and care to this contention, because the evidence is entirely circumstantial. ■ The law makes no distinction in the degree of proof required in either direct or circumstantial evidence, but requires that regardless of whether the evidence be direct or circumstantial, or a combination of both, it must be sufficient to establish the guilt of the defendant beyond a reasonable doubt. However, on appeal, the findings of a jury upon disputable questions of fact, whether supported by direct or circumstantial evidence, or both, must be given full faith and credit. It is only where, as a matter of law, there is no legal evidence supporting the charge that a reviewing court may disturb a verdict. ■ The rule upon an appeal in a criminal case is that the court must assume in favor of the verdict the existence of every fact which the jury could have reasonably deduced from the evidence, and then determine whether or not the guilt of the defendant is deducible therefrom. The question for this court to pass upon is whether there were facts before

the jury to justify the inference of guilt.   (*People* v. *Tom Woo*, 181 Cal. 315 [184 Pac. 389].)

Viewing the evidence, as this court must, in the light most favorable to the prosecution (*People* v. *Dukes*, 90 Cal. App. 657, 659 [266 Pac. 558]), such testimony can be epitomized as follows: During the months of September, October, November and December, 1937, Vernon R. Haggard was operating a bookmaking office on the third floor of a building in Pasadena.   On November 18, 1937, at 5 o'clock in the evening, and while Walter Coburn, an employee of the bookmaking agency, was counting the cash, a robber appeared, wearing a hood, and in the presence of Coburn and one Tim Donovan pointed a rifle at Mr. Coburn and took from him about $83 in cash, then disappearing and running down the stairs.   Fifteen days later, on the 3d of December, 1937, at approximately the same hour, Mr. Haggard was present in the same premises with Tim Donovan.   Again a robber appeared, wearing a hood and carrying a rifle, and demanded the cash, whereupon, Donovan said, ''Why you haven't got guts enough to pull that trigger,'' and grabbed the barrel of the gun and struck the intruder.   There was a struggle and the robber escaped, running downstairs, but leaving his gun.

The defendant, Leo Ekstrand, Jr., was a patron of this particular bookmaking office, where he had from time to time placed bets and had been seen by the aforesaid Haggard, Coburn and Donovan, as well as by the janitor of the building, about the place from time to time for approximately thirty days before the first hold-up.   The defendant was known to the attachés of the bookmaking establishment as Mr. Nash, under which name he placed his bets.   On the day of the second robbery, December 3d, according to the testimony of Mr. Haggard, the defendant was on the premises from about 1:30 or 2 o'clock until about ten minutes to five, and was wearing that day a pair of white corduroy trousers, a pinkish polo shirt and some heavy canvas shoes. About 5:30 P. M. on December 3d, approximately twenty minutes after the second robbery, the janitor found a box in the men's toilet on the third floor, containing a pair of cords and a polo shirt identified by the witness Haggard as being those worn by defendant earlier in the day. The defendant admitted that the clothes found in the toilet

belonged to him, but claimed that he had loaned them to a man known to him only as "Dick". The gun which was taken away from the robber by Donovan was admittedly a rifle borrowed by defendant on November 1st from one Kenneth Hudson. The defendant himself admitted that the rifle left at the scene of the crime was a rifle he had borrowed from Hudson, but claimed that the rifle was also loaned to this man "Dick". The shoes worn by the robber were described by the witness Haggard as being of unusual appearance and similar to those usually worn by the defendant when he was in and about the bookmaking establishment; while the box containing the clothes found in the toilet was admitted by the defendant to be one which had contained a vacuum cleaner purchased by the mother of defendant. There was further testimony by the janitor that he had seen the defendant carrying a similar box into the building before the first hold-up, and that about ten minutes after the first hold-up he saw the defendant running very fast downstairs from the third floor and out of the building, carrying a similar box. It was testified that the rifle used in the first hold-up on November 18th looked like the same rifle used in the hold-up of December 3d, and the hood worn by the robber at the second hold-up was testified to as being similar to the one seen on the perpetrator of the previous robbery. The defendant, following his arrest, made conflicting statements to the police, and while testifying in his own behalf at the trial admitted that he had borrowed the aforesaid rifle from Kenneth Hudson, but claimed that about 1:30 P. M. on the day of the original robbery he loaned the gun, together with some clothes, to a man named "Dick", whose last name or address he did not know, and whom he had known only slightly for some time prior to the robbery. The eye-witnesses to each robbery testified that the perpetrator thereof was about the height and build of the defendant. At all times the defendant denied his guilt, and presented evidence to support his alibi defense. Several inconsistencies appear in statements made by the defendant to the police officers, as well as in his testimony.

From the foregoing facts testified to at the trial, if believed by the jury, they were entitled to infer that the defendant was a customer of this bookmaking agency; that he was about the place a great deal, and was familiar with the

time and manner of counting the cash, as well as the time the customers left and the place was closed; that he borrowed the rifle from Kenneth Hudson and that a few days before the 18th of November, which was the date of the first robbery, he brought some dark clothes and the rifle, in a vacuum cleaner box, down to the bookmaking establishment; that a few minutes before closing time on November 18th, he went to the men's toilet on the third floor, changed his clothes, took the rifle, and accomplished the hold-up; and that he then went back into the men's toilet, put the clothes, the rifle and the money back into the vacuum cleaner box, and carrying the same, dashed bareheaded down the stairs and out of the building. With reference to the second robbery, the foregoing facts would justify the jury in concluding that the defendant again stayed about the bookmaking establishment until approximately closing time, and went again into the wash room and changed his clothes; but that his plans miscarried thereafter due to the fact that the witness Donovan engaged the defendant in a scuffle and took his gun away from him, whereupon the defendant rushed from the building, not having time to go to the wash room and obtain his other clothes; because it will be remembered that the vacuum cleaner box of clothes in the wash room was found by the janitor approximately twenty minutes after the second hold-up. ■ The jury was not required to believe the defendant's story about having loaned these clothes and gun to some mythical person known to him only as "Dick". While it is true that when evidence is open to two equally reasonable hypotheses, one pointing toward guilt and the other toward innocence, the jury must adopt that hypothesis tending toward innocence; nevertheless it will be noted that the two hypotheses must be equally reasonable. A mere reading of the facts of this case as narrated above leaves no room for doubt that the only reasonable hypothesis tended to prove the defendant's guilt, and that from the evidence the jury was justified in acting upon that theory.

■ Finally, appellant urges that the finding of the jury that he was armed with a deadly weapon at the time of the commission of both offenses should be set aside, on the ground that the rifle used in the hold-ups was loaded with a cartridge which did not fit that particular gun. In connection with this issue, the evidence shows that the rifle was a "22–caliber

long'', while the caliber of the cartridge found therein was a ''22–short''. There is testimony in the record that at the time the witness Donovan challenged the robber to pull the trigger on the rifle, the latter did so, but the weapon did not discharge. There is also testimony that while it would be possible for the rifle with the aforesaid ''short'' caliber cartridge in it to misfire, nevertheless, if the firing pin hit the rim of the cartridge it would probably discharge.

In this connection, appellant asserts that although any firearm, including a rifle, is enumerated in the Penal Code sections 969c and 1168, subdivision 2, as being a dangerous or deadly weapon, such a weapon as the rifle herein referred to is not enumerated as a deadly weapon in the Deadly Weapons Act (Stats. 1923, p. 695, and amendments thereto), and that the last-named act, being an attempt to legislate upon the entire deadly weapon field, is controlling over the Penal Code sections and entirely supersedes them.

A deadly weapon is defined generally as one ''capable of producing death or of inflicting great bodily injury'' (Words & Phrases, vol. 2, pp. 1853, 1854), while in subdivision 2 of section 1168 of the Penal Code, the term ''deadly weapon'' as used therein is defined to include any instrument or weapon of the kind commonly known as '' . . . pistol, revolver *or any other firearm*''. In *People* v. *Williams,* 100 Cal. App. 149 [279 Pac. 1040], and cases therein cited, it is held to be the well settled rule that a deadly weapon does not cease to be such by becoming temporarily inefficient, and that its essential character is not changed even by dismemberment, if the parts may be easily assembled so as to become effective. In the case at bar it cannot therefore be said that the jury was not justified in concluding, from an examination of the rifle and the cartridge therein contained, together with the foregoing testimony, that the rifle was capable of firing such cartridge. ■ It should also be here noted that section 969c of the Penal Code, which directs the pleading in the information of the fact that a defendant was armed at the time of the commission of an offense, and which section requires the jury to find upon that issue, provides that such fact shall be pleaded ''whenever a defendant is armed with a firearm or other weapon under such circumstances as to bring said defendant within the operation of subdivision 2 of section 1168 of the Penal Code relating to 'Certain

Minimum Penalties' ''. Clearly, subdivision 2 of section 1168 of the Penal Code, by its very language, ''or any other firearm'', includes a rifle of the type and character of the one here involved.

For the foregoing reasons, the judgment and the order denying defendant's motion for a new trial are, and each of them is, affirmed.

York, P. J., and Doran, J., concurred.