Filed 3/15/13  P. v. Jackson CA4/1

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE, | D061164 |
| Plaintiff and Respondent, | |
| v. | (Super. Ct. No. SCD233151) |
| ROBERT JOSEPH JACKSON, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Amalia L. Meza, Judge.  Affirmed.

A jury found Robert Joseph Jackson[1] guilty of residential burglary and robbery.  The court found true that he had five prison priors, four serious felony priors, and four strike priors and sentenced him to 46 years to life in prison.  Jackson appeals, contending (1) there was insufficient evidence to support his convictions,

---

[1] Defendant was charged in the second amended information as Robert Anderson aka Robert Joseph Jackson.  Prior to trial, he informed the court that his true name is Robert Joseph Jackson.  Accordingly, the court modified the information to reflect the defendant's name as Robert Joseph Jackson aka Robert Anderson.

and (2) his sentence constitutes cruel and unusual punishment.  We reject Jackson's contentions and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

In September 2010, Clifton and Ledesma Broadhurst were building a shed outside of their home when they heard a noise possibly coming from inside the house.  They went inside and saw their patio door was open and Ledesma's purse was sitting wide open on the freezer instead of in the cupboard where it was usually stored.  Clifton then saw a man trying to leave through a security door.  The man was African American, six feet four inches to six feet five inches tall, had a slender build and was wearing a white polo shirt with red and black stripes.  The man approached and said, "Everything is cool.  Everything is fine."  Clifton stepped in between the man and Ledesma and instructed the man to stay there while he called the police.  The man shoved Clifton out of the way and then grabbed Ledesma by the wrists and threw her to the ground.  After Clifton helped Ledesma up, he saw that the man had jumped over the gate in the front yard and was headed toward an alley.  When Clifton got to the alley, the man was gone.  In the meantime, Ledesma checked her purse and noticed that her wallet containing at least $30 was missing.  Clifton returned home where Ledesma was on the phone with a 911 dispatcher.

Duane Zugel, who lived in the area, heard the struggle and also called 911.  Zugel told the operator that he saw an African American male in his mid-twenties in a striped shirt run to an apartment complex north of him.  Zugel described the

2

suspect as being in his twenties based on the man's thin build and the way he was running.

Officer Richard Barton received a report of the burglary and set up a perimeter to attempt to locate the perpetrator. Officer Joseph Thomas was at a point on the perimeter when he heard a broadcast description of the suspect. A neighborhood resident told Officer Thomas that she saw a male matching the description of the suspect run behind her yard. On top of a bush in the front yard of a nearby residence, Officer Thomas found a polo shirt with vertical red, blue, white and green stripes. The shirt was moist with fresh sweat and blood stains. Approximately 10 feet away, just on the other side of a fence, officers found a wallet. Clifton and Ledesma later identified the shirt as the one the suspect had been wearing and the wallet as the one stolen from their home. The location where the shirt and wallet were found was about four-tenths of a mile from the Broadhurst's home.

Tests on the shirt and wallet revealed that both items had blood on them. A DNA analysis of samples taken from the shirt and wallet matched Jackson's DNA profile. The probability that a person selected at random would have the same DNA profile obtained from the items of evidence and Jackson was one in four sextillion African Americans.

*Defense*

Officer Timothy Lindstrom was one of the officers who responded to the burglary call. While he was driving to the area, Officer Lindstrom saw a man wearing a black and red striped shirt and who generally matched the description of

the suspect. The man ran when Officer Lindstrom approached. Officer Lindstrom chased him into an alley, but lost sight of him.

After receiving information from a neighbor, officers tracked down William Harrell, who had a warrant out for his arrest, at his home. Officers brought Harrell outside for a curbside lineup. Clifton was confident that Harrell was not the person who he saw inside his home. In an uncertain tone, Ledesma stated, "Yes, I think it's him." Officers took a DNA sample from Harrell, but did not arrest him. Harrell's DNA was not on either the shirt or wallet found by other officers.

The Broadhursts' neighbor, Johanne Geoffrion, testified that she saw a man wearing a striped shirt run down the sidewalk in front of the Broadhursts' home and into an alley. The man was agile and moving very fast. Geoffrion described the man as young, African American and five feet nine to five feet ten inches tall. The height description may not have been accurate because Geoffrion was looking down from her vantage point. Further, Geoffrion described the man as in his twenties based on the way he moved and because he did not have gray hair.

DISCUSSION

I. *Sufficiency of the Evidence*

A. Additional Facts

At trial, Officer Barton initially testified that he collected the shirt and wallet by placing them in one bag. He later clarified that testimony by stating that he must have used two separate bags for the evidence because his handwriting indicating different addresses was on two bags. He then placed the two smaller bags in one

4

larger bag. Officer Barton recalled that the shirt was moist with blood, but did not see blood stains on the wallet. Officers Thomas and Brandon Woodland both recalled that the evidence was in two separate bags. Similarly, Clifton testified that he thought the evidence was in two bags. However, Ledesma thought the items were in one bag.

After he collected the evidence, Officer Barton took the items to the Broadhursts' home. He took the wallet and shirt out of the bag and placed them on the trunk of his vehicle so that the Broadhursts could identify them. Officer Woodland and Clifton testified that an officer showed Clifton the shirt for identification by pulling a portion of it out of the bag and a similar procedure was used for the wallet. Ledesma stated that the evidence was shown to her in a bag and then put on the trunk of a police vehicle.

B. Analysis

Jackson contends there was insufficient evidence to support his convictions because nobody specifically identified him as the perpetrator, another man fitting the description of the suspect was found in the vicinity, and DNA from the shirt could have contaminated the wallet when the items were placed in the same bag.

In assessing challenges to the sufficiency of the evidence, we review the whole record in the light most favorable to the judgment to determine whether it contains substantial evidence from which a reasonable trier of fact could find guilt beyond a reasonable doubt. (*People v. Maury* (2003) 30 Cal.4th 342, 396.) It is not our function to reweigh the evidence (*People v. Ochoa* (1993) 6 Cal.4th 1199, 1206)

5

and reversal is not warranted merely because the circumstances might also be reasonably reconciled with a contrary finding. (*People v. Thomas* (1992) 2 Cal.4th 489, 514.) Our sole function is to determine if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. (*People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Marshall* (1997) 15 Cal.4th 1, 34.) Before a conviction can be set aside for insufficiency of the evidence, it must clearly appear that there is insufficient evidence to support it under any hypothesis. (*People v. Johnson* (1980) 26 Cal.3d 557, 575–578.) The same standard of review applies even "when the conviction rests primarily on circumstantial evidence." (*People v. Kraft* (2000) 23 Cal.4th 978, 1053.)

Here, despite Jackson's contentions, there was sufficient evidence to support his convictions. Although no witnesses were able to specifically identify Jackson as the perpetrator, direct identification evidence is not required so long as circumstantial evidence establishes guilt beyond a reasonable doubt. (*People v. Ekstrand* (1938) 28 Cal.App.2d 1, 3.) There was an abundance of circumstantial evidence in this case. The Broadhursts both described the perpetrator as a tall, thin African American man wearing a striped shirt. Neighbors gave a similar description. While the witnesses described the perpetrator as a young man or in his twenties and Jackson was actually 54 years old, the witnesses' descriptions were based on the perpetrator's agility and movements. Additionally, officers found a striped shirt moist with blood and sweat only about four-tenths of a mile from the Broadhursts' home. Jackson's DNA was on that shirt, and Ledesma's wallet was found only ten feet away from it.

We are not persuaded by Jackson's argument that there was insufficient evidence to establish he was the perpetrator because blood from the shirt could have contaminated the wallet. Although Officer Barton initially testified that he placed the shirt and wallet in one bag, he clarified that testimony by stating that he must have used two separate bags and then placed them in one larger bag. This procedure was supported by testimony from Clifton and Officers Thomas and Woodland who all recalled that the evidence was in two separate bags. Although Ledesma had a different recollection, the jury was free to reject her testimony and accept the testimony of other witnesses. The same is true regarding the discrepancies in testimony concerning the procedures used to show the shirt and wallet to the Broadhursts. Regardless, even without evidence of Jackson's DNA on the wallet, we conclude there was substantial evidence to support the convictions.

Lastly, we are not convinced that because Harrell generally fit the description of the suspect and was found in the vicinity, Jackson's convictions should be reversed. Harrell's DNA was not on the shirt or the wallet found near the crime scene, whereas Jackson's DNA was on the items. Additionally, Clifton was confident that Harrell was not the person who he saw inside his home and Ledesma was uncertain. The evidence involving Harrell does not negate the strong evidence supporting the jury's verdicts.

In sum, we conclude there was sufficient evidence to support Jackson's convictions.

7

## II. *Cruel and Unusual Punishment Claim*

A. Background

The court found true that Jackson had five prison priors, four serious felony priors, and four strike priors and sentenced him to a total term of 46 years to life in prison. As a result of Jackson's strike priors, his sentence included two terms of 25 years to life for the residential burglary and robbery. The robbery sentence was stayed pursuant to Penal Code section 654. Additionally, the court imposed a sentence of five years for each serious felony prior (20 years total) and one year each for Jackson's five prison priors. Four of the five prison prior terms were stayed.

Jackson's criminal history dates back to 1974 when he burglarized a home and stole a .22 caliber pistol. Less than two years later, while being pursued for a purse snatching incident, Jackson struck a police officer on the back of the head with an unknown object, resulting in a concussion. In 1978, Jackson was convicted of multiple burglary offenses. In 1980, he committed domestic violence against his girlfriend and became violent when arrested. Between 1984 and 2002, Jackson had additional theft-related convictions, including an incident where he forcefully stole a wallet out of a man's pocket, causing the pocket to tear and the man to fall to the ground, and an incident where Jackson grabbed a victim from behind while instructing someone else to steal the victim's wallet.

B. Analysis

Jackson contends that his sentence of 46 years to life constitutes cruel and unusual punishment under the federal and California Constitutions because his

8

current and past offenses were driven by drug addiction and did not result in serious harm to his victims. We reject this argument.

Under the California Constitution, punishment is disproportionate if it "shocks the conscience" considering the offender's history and the seriousness of his offenses. (*In re Lynch* (1972) 8 Cal.3d 410, 424.) In analyzing a disproportionality claim under the state Constitution, we examine (1) "the nature of the offense and/or the offender, with particular regard to the degree of danger both present to society" (*id.* at p. 425), (2) the sentence compared to the sentences for more serious offenses in California (*id.* at p. 426), and (3) the sentence compared to sentences for the same offense in other states (*id.* at p. 427; see also *People v. Dillon* (1983) 34 Cal.3d 441, 479). If a particular punishment is proportionate to the defendant's individual culpability, there is no requirement it be proportionate to the punishments imposed in other similar cases. (*People v. Webb* (1993) 6 Cal.4th 494, 536.) Accordingly, a determination of whether a punishment violates the state constitutional prohibition against cruel and unusual punishment may be based solely on the offense and the offender. (*People v. Ayon* (1996) 46 Cal.App.4th 385, 399.)

A defendant must overcome a considerable burden in order to establish that the sentence is disproportionate to his level of culpability. Successful challenges to proportionality are an "exquisite rarity." (*People v. Weddle* (1991) 1 Cal.App.4th 1190, 1196–1197.) Courts in a number of California cases have rejected claims that sentences under the Three Strikes law violated the state Constitution's prohibition against cruel or unusual punishment. (See, e.g., *People v. Romero* (2002) 99

9

Cal.App.4th 1418, 1431–1432 (*Romero*); *People v. Cortez* (1999) 73 Cal.App.4th 276, 286; *People v. Askey* (1996) 49 Cal.App.4th 381, 388.)

With regard to the first prong of the analysis, Jackson asserts that although he has sustained numerous convictions, they were the result of his inability to control his drug addiction and nobody was seriously harmed during the offenses. Jackson argues that the offenses that resulted in harm to his victims took place more than 30 years ago and, since that time, his offenses do not reflect a continuing pattern of violent behavior. Jackson downplays the significance of his long and serious criminal history. In addition to the incidents where Jackson assaulted a police officer and committed domestic violence against his girlfriend, he also harmed the Broadhursts, forcefully stole a man's wallet causing the victim to fall to the ground, and grabbed a victim from behind and held him while someone else stole the victim's wallet. While the motivation for these crimes may have been to support Jackson's drug addiction, they included force, fear and violence. Further, we note that there is no indication that Jackson has attempted to address his destructive drug addiction.

Jackson's lengthy criminal history has not been deterred by parole and was interrupted only by periods of incarceration. In addition to the nature of the current offense, "recidivism is a legitimate factor to consider when imposing a greater sentence than for a first time offense." (*People v. Cuevas* (2001) 89 Cal.App.4th 689, 704–705.) "Under the three strikes law, defendants are punished not just for their current offense but for their recidivism. Recidivism in the commission of multiple felonies poses a danger to society justifying the imposition of longer

10

sentences for subsequent offenses. [Citation.]"  (*People v. Cooper* (1996) 43 Cal.App.4th 815, 823–824.)  Despite his admitted drug addiction, Jackson has not changed his behavior and has engaged in conduct resulting in harm to others to support his addiction.  While Jackson's sentence is harsh, it is not disproportionate to his culpability.  (*People v. Stone* (1999) 75 Cal.App.4th 707, 715 [25 years to life sentence for a nonviolent drug offense is constitutional].)  Although we find Jackson's sentence was not disproportionate based on his current offenses and criminal history, we nevertheless consider the other disproportionality factors.

Jackson next compares his punishment with punishments that are prescribed for more serious crimes in California, including voluntary manslaughter, rape, kidnapping and premeditated murder.  He contends that he poses a lesser danger to society than persons who commit those crimes.  We reject Jackson's comparison of his sentence under the Three Strikes law to the sentence for first degree murder or to the sentences for other serious or violent crimes, in the absence of prior strikes.  (See, e.g., *Romero*, *supra*, 99 Cal.App.4th at p. 1433 [" ' "Because the Legislature may constitutionally enact statutes imposing more severe punishment for habitual criminals, it is illogical to compare [defendant's] punishment for his 'offense,' which includes his recidivist behavior, to the punishment of others who have committed more serious crimes, but have not qualified as repeat felons."  [Citation.]' [Citation.]"].)

Jackson also compares his sentence to recidivist punishments for similar crimes in other jurisdictions, asserting that "[t]here appears to be no state besides

11

California with a recidivist statute requiring such mandatory application and lengthy imprisonment regardless of mitigating circumstances." The fact " '[t]hat California's punishment scheme is among the most extreme does not compel the conclusion that it is unconstitutionally cruel or unusual. This state constitutional consideration does not require California to march in lockstep with other states in fashioning a penal code. It does not require "conforming our Penal Code to the 'majority rule' or the least common denominator of penalties nationwide." [Citation.] Otherwise, California could never take the toughest stance against repeat offenders or any other type of criminal conduct.' " (*Romero*, *supra*, 99 Cal.App.4th at p. 1433, quoting *People v. Martinez* (1999) 71 Cal.App.4th 1502, 1516.)

Accordingly, we reject Jackson's argument that his sentence constitutes cruel and unusual punishment under California's Constitution. Similarly, we cannot say that Jackson's Three Strikes sentence violates the federal Constitution based on his present offenses and past recidivism. The Eighth Amendment of the federal Constitution includes a narrow proportionality protection against grossly disproportionate sentences, but the constitutional protection against such sentences applies only in the " 'exceedingly rare' " and " 'extreme' " case. (*Ewing v. California* (2003) 538 U.S. 11, 17–18, 20, 21, 29–30 (plur. opn. of O'Connor, J.) [affirming a sentence of 25 years to life under the Three Strikes law for a recidivist who had shoplifted golf clubs worth $1,200, and whose prior convictions were for theft, grand theft of an automobile, burglary, robbery, and battery]; *Lockyer v. Andrade* (2003) 538 U.S. 63, 77 [two consecutive 25 years to life terms for two petty thefts not

12

grossly disproportionate].) In view of Jackson's current and past offenses and his continuous criminal history, which has not been deterred, we conclude his sentence is not grossly disproportionate to his crimes and does not shock the conscience. Thus, Jackson's sentence does not constitute cruel and unusual punishment.

DISPOSITION

The judgment is affirmed.


McINTYRE, J.

WE CONCUR:

HUFFMAN, Acting P. J.

McDONALD, J.